### In re COLBY CONSTRUCTION CORP., Debtor-in-Possession.

**Bankruptcy No. 85 B 10808.**

United States Bankruptcy Court,
S.D. New York.

July 15, 1985.

S. Mac Gutman, Forest Hills, N.Y., Glass & Howard by Robert L. Howard, Corwin & Solomon, by Erwin L. Corwin, New York City, Shaw, Goldman, Licitra, Levine & Weinberg, by Jesse I. Levine, Garden City, N.Y., Stanton Halpern, Long Island City, N.Y., for movants.

Gerald Zisholtz, Mineola, N.Y., for Robert B. Samuels Inc.

The Office of the United States Trustees for the Southern District of New York by Cornelius Blackshear, United States Trustee, New York City.

Ballon, Stoll & Itzler, by Sheldon S. Lustigman, and Bruce Gordon, New York City, for debtor.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

On May 15, 1985, three subcontractors, Pem Electrical Corp., Superior Mechanical Corp., and Stevens Drywall Corp., (collectively referred to "creditors") filed an involuntary Chapter 11 bankruptcy petition against Colby Construction Corp. ("Colby"). Three other creditors, Coyne Electric Co., Glenn Partition, Inc., and L. Rosenman Corp., intervened in support. Upon Colby's consent, an order for relief under Chapter 11 was entered.

The creditors-subcontractors seek an order (1) appointing a trustee pursuant to 11 U.S.C. § 151104(a) of the Bankruptcy Code (the "Code"), or in the alternative, converting the Debtor's Chapter 11 status to one under Chapter 7 of the Code pursuant to § 1112(b)(1), and (2) permanently enjoining

the disposal of the Debtor's assets. Trial as to the motion for an order appointing a trustee was held on June 12 and 13, 1985.[1] On the basis of the evidence presented and our assessment of the credibility, of the various witnesses, appointment of a trustee is mandated in this case. An order to that effect was entered on the record on July 11, 1985. This memorandum sets forth the reasons for that order.

### Facts

Colby was formed and incorporated pursuant to the law of the state of New York in May 1981 as a general contractor. Joseph Coppotelli is a 60% shareholder; Louis Angeletti owns the remaining 40% of the shares. Coppotelli is the president and sole salesman of Colby. On May 15, 1985 he joined a competitor, Herbert Construction Co. Angeletti handled the day-to-day operations of Colby as secretary-treasurer and construction manager.

Prior to effectively ceasing operations on or about June 12, 1985, Colby was milked of funds by its management. Coppotelli acquired a 50% interest in two corporations—Manhattan Equity Investors ("MEI") and Manhattan Realty Management—with a $100,000.00 bank loan. To secure the loan, he pledged Colby's certificate of deposit by forging Angeletti's name. Coppotelli subsequently defaulted on the loan and the bank foreclosed on Colby's certificate. In 1984, Coppotelli and Angeletti borrowed a total of at least $91,-551.00 without any documentation evidencing the obligations; Coppotelli's portion included a $40,000.00 loan taken by him in October 1984, but returned to Colby, at Angeletti's insistence in February 1985.

In similar vein, Colby spent over $26,-000.00 for a Christmas party at Regines discotheque. Coppotelli's 1985 membership dues at the New York Athletic Club and at the Southampton Bath and Tennis Club, which is not yet open, were paid by Colby.

As might be expected from a company run in this manner and which is now bankrupt, Colby's accounting system is far from adequate and seriously lacking in internal controls. Although a member of David Beardon & Co., Colby's accountant, testified that in June 1984, Colby's records were in tolerable condition; he also observed that extensive procedures were necessary to conduct a review of Colby's unaudited financial statements. No such work has taken place since Fall 1984 when Colby hired a bookkeeper who attempted to match revenues and payments to jobs. These efforts were insufficient. Colby lacks separate records and bank accounts accurately reflecting the sums received and disbursed for each project and the dates of such receipts and disbursements since June 1984. Its most recent accounts payable show a payment of $2,176.083.00 to 40 subcontractors without allocation by project. Nor do any records evidence the source of funds received or appropriately described as payments to subcontractors. In addition, Colby has not posted its accounts since August 1984 and it has not reconciled its bank statements since December 1984. As a result, it has experienced substantial internal billing problems with approximately $500,000.00 of extras and change orders as yet unbilled.

The records that do exist, moreover, indicate that Colby have not forwarded to subcontractors all of the sums it received for their work. Its financial statements, as of December 31, 1983 and June 30, 1984 and converted into cash basis, indicate that Colby was paid $700,000.00 and $1,000,000 respectively more for work performed by subcontractors than has been paid to subcontractors and is owed to them. Although Colby maintains that its figures are conservative, the subcontractors' accountant, after a careful review of Colby's books and accounts, is of the opinion that the amounts

---

1. Post trial findings of fact and conclusions of law were submitted on June 27, 1985. The branch of the motion seeking the conversion was not entertained given the failure to give 20 day-notice of such a motion as required by Rule 2002(a)(5) of the Rules of Bankruptcy Procedure and is thus denied.

**116**

owed to subcontractors substantially exceed Colby's estimates.

*Discussion*

Section 1104(a)(1) of the Code provides that:

> ... the court shall order the appointment of a trustee
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management ...

The legislative history to that section states that the court "may order appointment only if the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), 1978 U.S.Code Cong. & Ad.News. 5787, 5901. The "shall" language of the statute and the "may" language in the legislative history have caused some confusion. A majority of courts favor giving more discretion to a bankruptcy court than the statute would indicate and adopt a balancing approach, citing *Lemon v. Kurtzman*, 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469–70, 36 L.Ed.2d 151 (1973) (when reconciling competing considerations court must be guided by inescapable realities). *See In re Potts & Co., Inc.*, 20 B.R. 3, 4 (Bankr.E.D.Pa.1981) (fact that a corporation engages in business with related companies does not *de jure* establish a conflict of interest warranting the appointment of a trustee); *In re Steak Loft of Oakdale*, 10 B.R. 182, 186 (Bankr.S.D.W.D.Ohio 1981) (§ 1104 is flexible allowing court discretion to treat each case individually); *In re Main Line Motors, Inc.*, 9 B.R. 782, 784 (Bankr.E.D.Pa.1981) (court must weigh various considerations and competing interests carefully under § 1104); *Hotel Associates, Inc. v. Trustees of Central States SE & SW Areas Pension Fund (In re Hotel Associates, Inc.)*, 3 B.R. 343, 345 (1980) (courts necessarily resort to broad equity powers); *Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*, 11 B.R. 552, 553 (Bankr.S.D.W.Va.1981) (Congress intended to adopt a flexible standard requiring an analysis of each case's peculiar circumstances.) [2]

Here the evidence overwhelmingly shows that Coppotelli's acts are what this court in *Hassett v. Ganz (In re O.P.M. Leasing Services, Inc.)*, 21 B.R. 986, 988 (Bankr.S.D.N.Y.1982) deplored as "faithless conduct" that breaches the very fiduciary duty incumbent upon management, and requires the appointment of a trustee. *See Clarke & Rapuano, Inc. v. Morris Ketchum, Jr. & Assoc. (In re Morris Ketchum, Jr. & Assoc.)*, 409 F.Supp. 743, 746 (S.D.N.Y.1975). His deliberate, unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section.

The need for a trustee is further shown by management's disregard of fiduciary concepts in the agreement by Coppotelli, Colby's sole marketing officer, to work for a competitor, and in the withdrawal of funds by Coppotelli and Angeletti. Withdrawals of funds by management pursuant to transactions euphemistically styled "loans" but bereft of documentation amounts to gross mismanagement within the meaning of § 1104(a)(1). *In re Main Line Motors, Inc.*, 9 B.R. at 784. This sort of gratuitous "borrowing" is, moreover, a conflict of interest requiring the appointment of a trustee to protect creditors. *See Smith*, 11 B.R. at 554 (loyalty of defendant to debtor's rehabilitation is called into question by his competing interests and the potential inter-company dealings to the benefit of his own firms); *In re L.S. Good &*

---

**2.** Further confusion has occurred upon some courts requiring clear and convincing evidence that appointment of a trustee is necessary. *See In re Tyler*, 18 B.R. 574, 577 (Bankr.S.D.Fla. 1982); *Official Creditors' Committee v. Liberal Market, Inc. (In Matter of Liberal Market, Inc.)*, 13 B.R. 748, 751 (Bankr.S.D.W.D. Ohio 1981). There is nothing in the Code or its legislative history indicating that Congress desired to impose such a burden of proof. We need not decide that question here in view of this record where such evidence is amply presented.

*Co.*, 8 B.R. 312, 315 (Bankr.N.D.W.Va.1980) (potential conflicts of interest found where large management fees have been paid to the parent company and substantial intercompany transactions have taken place); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62 (Bankr.E.D.Pa.1981) (adverse interests found when management planned ultimately to obtain debtor's sole ownership.)

■ Coppotelli's depletion of Colby's assets by using them to pay exorbitant membership dues in his various clubs and for a lavish Christmas party, when not fully paying subcontractors the funds received on their behalf, similarly, requires the appointment of a trustee. This callous indifference to Colby's welfare and its numerous creditors is similar to that encountered in *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.)*, 3 B.R. 169 (Bankr.N.D.Ga. 1980). There the court appointed a trustee where, *inter alia*, top management persisted in drawing excessive compensation and provided with luxurious housing and cars from corporate funds. *Id.* at 173–175.

■ Furthermore, that Colby's books and records are in disarray and, most significantly, that they do not itemize payments to subcontractors, requires the appointment of a trustee. That Colby after Fall 1984 had not only lost control of its own house but also failed to account for job receipts raise the presumption afforded by Article 3A of the New York Lien Law. Under New York Law, funds received by a general contractor in payment for work performed by such contractors are denominated trust funds [3], New York Lien Law § 70(1) (McKinney's 1966), and are to be held and accounted for as such. *Id.* § 75. Failure of the general contractor to keep adequate and detailed books and records

identifying receipts and expenditures by project

shall be presumptive evidence that the trustee has applied or consented to the application of trust funds actually received by him as money for purposes other than a purpose of the trust ...

*Id.* § 75(4). In view of the large, unexplained shortfalls, shown by Colby's 1983 and 1984 financial statements, that presumption applies here and it was not rebutted. Testimony as to Colby's records prior to the period in question or by the unconvincing testimony of Colby's bookkeeper that file cards were maintained was hardly sufficient in light of the totality of this record. Nor was it rebutted by showing that subcontractors, in the absence of appropriate allocation by Colby, applied funds transmitted to them to the invoice outstanding for the oldest job on which they worked. The presumed misuse of trust funds, constitutes at least gross mismanagement as defined by § 1104(a)(1) if not actual fraud.

■ Even without the benefit of the presumption, gross mismanagement exists under § 1104(a)(1) where the debtor's accounting system fails to reflect its financial condition and when the condition of its books and records is in shambles. *In Hotel Associates, Inc.*, 3 B.R. at 345. To the same effect is *In re Philadelphia Athletic Club, Inc.*, 15 B.R. at 63, where a trustee was appointed because of the debtor's failure to keep adequate records and the commingling of the debtor's assets with those of a firm controlled by a shareholder of the debtor. *Id.* at 63.

This case of fraud and gross mismanagement demands the appointment of a trustee pursuant to § 1104(a) of the Bankruptcy Code.[4] Such an appointment, also, is obvi-

---

3. *See Besroi Construction Corp. v. Kawczynski (In re Kawezynski)*, 442 F.Supp. 413, 417 (W.D. N.Y.1977), ("the trust commences when the contractor first receives payment from the owner whether or not there shall be at that time any beneficiary of the trust and continues until all of the trust beneficiaries have been paid." Failure to turn over such funds may be larcenous); *In re Clarke & Rapuano, Inc.*, 409 F.Supp. at 746

(general contractor must turn funds over to subcontractors within 30 days of the receipt date; failure to do so could constitute larceny); New York Lien Law § 79–a(1)(b).

4. Given the appointment of a trustee, there is no need to address that branch of the motion seeking a permanent injunction.

ously in the best interests of creditors under § 1104(a)(2). The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.