**In re MAKO, INC., EIN 73–1775360, Debtor.**

**Bankruptcy No. 88–00475.**

United States Bankruptcy Court, E.D. Oklahoma.

June 28, 1988.

Thomas Baines, Tulsa, Okl., for Sanders.

Mark A. Farmer, Oklahoma City, Okl., for AmEx.

Mark A. Grober, Muskogee, Okl., for Anderson.

E. Lamar Pettus, for Northwest.

Jack H. Santee, Tulsa, Okl., for Delaware.

Katherine Vance for U.S. Trustee.

Mitchell E. Shamas and James Conrady, Okmulgee, Okl., for the DIP.

## ORDER

JAMES E. RYAN, Bankruptcy Judge.

On June 17, 1988, a hearing was conducted by this Court in the above captioned case with regard to the Motions of creditors, Sanders Oil Company (Sanders), American Express Travel Related Services Company (AmEx), Delaware County Bank (Delaware) and Anderson Wholesale Company (Anderson) for Appointment of an Interim Trustee, Appointment of a Trustee, and an alternative request for appointment of an Examiner.

Objections to these Motions were entered by Mako (DIP), Northwest Oil Company, Community Bank of Bristow, Oklahoma, Farha Realty Trust, John E. and R. Joy Crutchfield, Oklahoma Tank Lines, Inc. and a myriad of objections from franchisees in the Mako organization (36 different parties).

Appearances were made by counsel Thomas Baines for Sanders, Mark A. Farmer for AmEx, Mark A. Grober for Anderson, E. Lamar Pettus for Northwest, Jack H. Santee for Delaware, Katherine Vance for the United States Trustee, and Mitchell E. Shamas and James Conrady for the DIP.

Since most of the movants adopted either in whole or in part the Motion and Brief filed by Sanders and AmEx, these will be the arguments mainly addressed by this Order. Also, in the course of the hearing, Anderson withdrew its Motion to appoint a Trustee and only encourages the appointment of an Examiner by this Court. A report from the Committee of the Unsecured Creditors was also received by this Court recommending the appointment of an Examiner only.

Upon review of the many Motions, the evidence submitted at the hearing and the applicable law in this area, we FIND:

## FINDINGS OF FACT

1. This is a "core" proceeding as defined in 28 U.S.C. § 157(b).

2. The DIP, an Oklahoma Corporation, is engaged in the business of franchising a series of convenience stores. Since 1978, the President and CEO of the DIP has been Mr. James L. Treat.

3. From the beginning in this capacity, Treat and other corporate officers engaged in the taking out of personal loans with the DIP. Since Treat is an "insider" as defined in the Bankruptcy Code at 11 U.S.C. § 101(30)(B), these were insider loans with no provisions for interest, term or collateral securing the loan.

The sole method of memorialization from an accounting standpoint for these loans was a notation in the corporate books as an "advance to shareholder" or "advance to employee" and a retention of the canceled checks.

4. Treat testified that the funds from these loans, which amounted to approximately $2.8 million over a ten year period, were used to pay personal obligations as guarantor on various loans of other parties, none of which were to benefit Treat directly. Within the approximate nine months pre-Petition, Mr. Treat made payments on his debt to the DIP, actually reducing his indebtedness.

5. In early 1987, an attempt was made to inject capital into the rapidly decreasing short-term cash flow of the DIP through a sale of Debtor assets to Midland Stores, Inc., another entity of which Treat was in control. This attempt ended in an additional loss of $100,000 in earnest money when financing could not be properly obtained. This money effectively belonged to the DIP since Treat borrowed from its cash reserve to initiate the sale.

6. In December, 1987, Security National Bank of Sapulpa (Security) changed its policy toward the DIP regarding deposits to the DIP's account and check processing.

Prior to December, 1987, Security credited the DIP's account with the amount that was to come in daily from the various store franchisees *before* actual receipt of the deposits. The amount was relayed by telephone from the stores to the DIP, who in turn contacted Security and forwarded this amount so that the account could be credited. Beginning in December, however, Security refused to continue this one-day credit float by requiring the franchisee deposits to actually be received by the Bank prior to crediting the DIP's account. This effectively ended the one-day credit lag and put the DIP two days behind in daily checks drawn on the account. This prompted traders such as Sanders to demand payment and threaten to cease supplying product. The DIP was forced to prioritize the payment of checks in order to keep the stores operating.

Security's Vice President reluctantly testified that after receiving the daily checks to suppliers, Security consulted with DIP regarding which checks were to be honored and which were to be returned since funds on account were insufficient due to the delay in processing.

7. Also, during this time (December, 1987), AmEx was issued checks to cover remittances on the sale of their Money Orders. These checks likewise fell insufficient.

Pursuant to a Trust Agreement entered into between the DIP and AmEx (dated August 5, 1986), the funds obtained through the sale of AmEx Money Orders were to be held in trust, with the DIP acting in a fiduciary capacity as a trustee with respect to any Money Orders or proceeds from the sale thereof. It is undisputed through testimony that the funds that were to have been kept in trust for AmEx are no longer available to the DIP as they were not kept segregated as provided for in the Trust Agreement.

8. The DIP was found in default when the checks written to cover remittances did not clear the Bank. The parties then entered into a Forebearance Agreement (dated January 29, 1988) which provided for payment of the delinquent sum due and owing from January 1 to February 1, 1988 (which amounted to approximately $300,000). At this time, representatives of AmEx had the opportunity to investigate the practices of the DIP regarding segregation of funds from the sale of the Money Orders, but this they chose not to do.

After further remittance checks were found to be insufficient, the DIP was ordered to cease selling Money Orders by AmEx on March 30, 1988. The remaining blank Money Orders were removed from the various stores by an AmEx representative soon thereafter. Some 9,200 of these Money Orders remain unaccounted for according to AmEx.

9. The short-term cash flow deficiencies finally overtook the DIP and culminated on April 29, 1988 in the filing for Chapter 11 bankruptcy reorganization.

## CONCLUSIONS OF LAW

A. The request of Sanders for an Interim Trustee can be quickly disposed of as to 11 U.S.C. § 303(g) upon which Sanders relies as it clearly limits its application to involuntary cases filed under the provisions of Chapter 7. Since the present action is a voluntary Chapter 11, this argument is inappropriate.

B. The applicable law for the appointment of a Trustee in Chapter 11 for cause under the Bankruptcy Code is found in 11 U.S.C. § 1104(a)(1) which states:

"(a) At any time after the commencement but before confirmation of a Plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the Court shall order the appointment of a trustee—

(1) *For cause, including fraud, dishonesty, incompetence, or gross mismanagement* of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor."

C. For "cause" to be found by this Court, the movant must prove its existence

by a clear and convincing burden of proof. *In re Tyler,* 18 B.R. 574 (Bankr.S.D.Fla. 1982). The Bankruptcy Code in § 1104(a)(1) includes a non-exclusive list of possible "causes"—fraud, dishonesty, incompetence or gross mismanagement—to justify the appointing of a Trustee.

■ A finding of fraud recognizes the existence of some misrepresentation and requires a breach of the "duty of each to refrain from even attempted deceit of another with whom he deals and the right of the latter to assume he will do so." *In the Matter of Garman,* 625 F.2d 755 (7th Cir. 1980). These cases usually involve some blatant attempt by the debtor to deceive the creditors to the profit of the debtor and the detriment of the creditors. This is demonstrated in cases where assets were sold just prior to the filing of the Petition with the knowledge that the transfer would be avoided, *In re Russell,* 60 B.R. 42 (Bankr.W.D.Ark.1985), or where a complete conversion of corporate assets occurred. *In re Colby Construction, Inc.,* 51 B.R. 113 (Bankr.S.D.N.Y.1985).

In the instant case, no such misrepresentations were propagated by the DIP management. The check policy change was not instituted by the DIP to deceive the creditors but rather was a change by the Bank in no longer allowing the interim credit between demands being made on the account and deposits being made into the account. The argument of AmEx asserting "constructive fraud" has its foundation in state law upon which this Court feels no obligation to rely.

Dishonesty appears to be considered by the various Courts as a lesser form of fraud, still relying on a certain degree of misrepresentation. *In re Colby Construction, Inc.,* supra. Again, no evidence of obvious misrepresentation was offered into the record by movants. All transactions are recorded and evidenced by some bookkeeping. The mere fact that some discrimination among suppliers for payment occurred does not equate with dishonesty, but rather makes clear the desperation of the short-term situation and the continued

desire of the management to allow the operation to function.

■ Incompetency has its roots in mismanagement, requiring a showing of a lack of business acumen and ability. *In re LaSherene, Inc.,* 3 B.R. 169 (Bankr.N.D. Ga.1980). Since the current management operated the organization for ten years effectively and successfully, no evidence of a sudden loss of ability is obvious to this Court.

■ Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization. *In re Brown,* 31 B.R. 583 (Bankr. D.D.C.1983). But it must rise above simple mismanagement to achieve the level envisioned by the Code. *In re Anchorage Boat Sales, Inc.,* 4 B.R. 635 (Bankr.E.D.N.Y. 1980). Some mismanagement exists in every insolvency case. *In re LaSherene, Inc.,* supra. The movants suggest that the practice of insider loans by the management is demonstrable of "gross" mismanagement. Clearly, the timing of the insider loans was questionable. However, it is equally clear that these loans were not the sole cause of the short-term deficiency of the DIP. These obligations had occurred over an extended period of time (some ten years), during most of which the DIP enjoyed substantial growth and success. Only when the policy of Security was changed and market conditions deteriorated did the DIP see its cash flow diminish. The Bankruptcy Code offers no prohibition or admonition for insider loans. Thus, it would be presumptuous to consider these loans as rising to the level of gross mismanagement.

It is suggested by this Court that the DIP memorialize the insider loans with a set term, interest rate and security agreement, and address this matter in the proposed Plan and Disclosure Statement. This is essential to the integrity of the DIP.

D. A policy of flexibility pervades the Bankruptcy Code with the ultimate aim of protecting creditors. "To require the appointment of a trustee, regardless of the consequences, in the event of an act of the debtor, however slight or immaterial, could

frustrate the purposes of the bankruptcy act. Section 1104(a)(1), therefore, must be construed, if possible, to make it harmonious with the act in its entirety. Such construction requires that the Courts be given discretionary authority to determine whether conduct rises to the level of 'cause'." *Dalkon Shield Claimants v. A.H. Robins Co., Inc.,* 828 F.2d 239 (4th Cir.1987). In the present case, we find that it does not achieve that level.

E. The allegations raised by AmEx regarding violation of its Trust Agreement with the DIP are of somewhat clouded merit. The evidence clearly showed that AmEx had the opportunity to investigate the practices of the DIP with regard to keeping separate trust accounts for AmEx funds, and did not choose to do so. Also, AmEx's assertion that it is common industry practice to keep segregated trust accounts lacks any sense of reality or practicality.

The assertion that employee withholding taxes were not held in trust and are still due and owing is not the concern of these parties and thus will not be considered. Since the Internal Revenue Service has not sought to join in this Motion to appoint a Trustee pursuant to the actions of the DIP, these parties should not presume to do it for them.

F. The movants have offered three cases for consideration in this matter to determine "cause." *In re St. Louis Globe–Democrat, Inc.,* 63 B.R. 131 (Bankr.E.D. Mo.1985), a case involving a bankrupt newspaper which withheld union dues from its employees but failed to turn them over to the union. This case may be distinguished from the present matter in that the union had no knowledge of the failure until the Petition had been filed. AmEx had the opportunity to discover the problem of its "trust funds" pre-Petition and did not pursue it and in fact, continued the relationship by signing the Forebearance Agreement, thereby allowing the practice of not segregating funds from Money Order sales to continue.

Further, the newspaper continued its practice of keeping the withheld union dues

post-Petition despite an Order of the Court in the cited case. In the present case, the insider loaning practice has stopped and will not continue.

*In re Colby Construction Corp.,* 51 B.R. 113 (Bankr.S.D.N.Y.1985) involved the purchase of a second entity with funds converted from the debtor organization. Evidence of forgery, personal profit and intercompany dealings was presented. In the present case, no such action has occurred. The loans were used for the purpose of paying back loans for which Treat was guarantor, not for personal profit. Further, these loans were documented in the corporate books and no attempt to cover their occurrence was made.

Finally, *In re Main Line Motors, Inc.,* 9 B.R. 782 (Bankr.E.D.Pa.1981), concerned the withdrawal of funds from the debtor company by the sole shareholder to inject into two other business ventures. But these transfers were not insider loans as in the case before this Court. They were in fact inter-company transfers for the profit of the shareholder.

Also, some evidence of an attempt to cover the transfers by using a "creative accounting" method was offered in *Main Line.* No such attempt was made in the present case, as the transactions were documented simply for what they were—insider loans.

G. The second method by which a Trustee may be appointed is found in 11 U.S.C. § 1104(a)(2) which provides in the alternative to (a)(1):

"(a) ... The Court shall order the appointment of a Trustee—

(2) If such appointment is in the interests of creditors, any equity security holders, and the interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor."

In this case, the interest of the creditors is not served by draining the assets of the estate in the costly appointment of a Trustee. Further, the complications involved with the administration of a business of

**814**

this type would take very specialized knowledge on the part of the Trustee and excessive delay in implementation of a Plan since it would take time for the Trustee to acquaint himself with this extensive organization. The present management is in a much better position to handle this administration.

Additionally, the Court cannot turn a deaf ear to the many voices sharing support for the current management; most notably the Unsecured Creditors' Committee. These groups show continued confidence in the ability of the established management to effectuate a Plan of Reorganization.

■■■ H. The alternative to appointing a Trustee is to appoint an Examiner. This is a less costly, intermediate method of policing the DIP. Absent further waste or depletion of the estate, an Examiner rather than a Trustee should be appointed to investigate the propriety of pre-Petition transfers of the Debtor's estate. *Matter of Hamiel & Sons, Inc.*, 20 B.R. 830, 9 Bankr. Ct.Dec. (CRR) 321 (Bankr.S.D.Ohio 1982). No further loans will be made during the bankruptcy, thus the estate will not be depleted further.

Appointment of an Examiner is governed by 11 U.S.C. § 1104(b)(1) which states:

"(b) If the Court does not order the appointment of a trustee under this section ... the Court shall appoint an examiner to conduct such an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor if—

(1) Such appointment is in the interests of creditors, any equity security holders and other interests of the estate ..."

In the present case, an Examiner will keep his finger on the pulse of the business to protect the interests of the creditors while investigating that the alleged improprieties do not warrant the appointment of a Trustee. This should calm the creditors' fears that any further deterioration of corporate assets will occur while limiting the drain on the estate. This appointment has the support of the Unsecured Creditors' Committee as well as many of the other creditors with objections.

I. After reviewing the candidates for Examiner submitted by Sanders and the Unsecured Creditors' Committee, this Court finds that to conduct a full investigation into the DIP, potentially requiring issuance of subpoenas and other legal action, an accounting firm alone will not suffice. To avoid the added expense to the estate of appointing counsel to assist an accounting firm, this Court urges the U.S. Trustee to appoint, pursuant to 11 U.S.C. § 1104(c), an Examiner in this matter who is proficient in both accounting and law with the latter containing specialized training in the Bankruptcy Code.

IT IS THEREFORE ORDERED that the Motions to Appoint an Interim Trustee and a Trustee are denied. IT IS FURTHER ORDERED that the U.S. Trustee appoint an Examiner in this cause and seek this Court's approval of the scope of authority extended, directions given, as well as the estimated fee and expenses. U.S. Trustee shall confirm DIP's capability of paying the estimated costs prior to requesting a hearing, after notice to interested persons, before this Court on said approval.