**In re PRS INSURANCE GROUP, INC., Debtor.**

**No. 00–4070(MFW).**

United States Bankruptcy Court, D. Delaware.

Feb. 23, 2001.

Joseph Grey, Robert Lapowsky, Stevens & Lee, Wilmington, DE, Proposed Counsel for PRS Insurance Group, Inc.

James R. Rishel, Rinehart & Rishel, Ltd., Columbus, OH, Proposed Special Counsel for PRS Insurance Group, Inc.

James L. Patton, Maureen D. Luke, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Harold S. Horwich, Bingham Dana, LLP, Hartford, CT, Counsel for Allstate Insurance Company.

Bonnie Glantz Fatell, Michael D. DeBaecke, Blank Rome Comisky & McCauley, Wilmington, DE, Stephen D. Lerner, Squires Sanders & Dempsey, LLP, Cincinnati, OH, Counsel for Firstar Bank, N.A.

Steven K. Kortanek, James E. Huggett, Klehr Harrison Harvey Branzburg & Ellers LLP, Wilmington, DE, Counsel for the Ohio Department of Insurance.

## *MEMORANDUM OPINION* [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Amended Motion for Appointment of Interim Trustee

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested

("the Trustee Motion") filed by Allstate Life Insurance Company, joined by Firstar Bank, N.A., and the opposition thereto filed by PRS Insurance Group, Inc. ("the Debtor"). For the reasons set forth below, we grant the Motion.

## I.  FACTUAL BACKGROUND

The Debtor, a holding company with no business operations, owns several companies, one of which is Credit General Insurance Company ("CGIC"). The Debtor has only two employees: Robert Lucia, its president, sole director and sole shareholder, and Ronald Pipoly, Vice President/Controller.

In early June, 2000, the Ohio Department of Insurance ("the ODI") took supervisory control of CGIC. Mr. Lucia consented to the Supervision Order and agreed to resign from all positions he held with CGIC and the Debtor. (Exhibit P–8). Mr. Pipoly remained with CGIC and the Debtor during the ODI supervision. Between June and November, 2000, the Supervisor of CGIC allegedly caused assets of the Debtor and other subsidiaries of the Debtor to be transferred to CGIC for less than fair value.[2] (Exhibits P–19 and P–20).

In November, 2000, CGIC agreed to be placed in receivership. (Exhibit P–9). The Debtor and Mr. Lucia consented to that action. (Exhibits P–10 and P–11). At that time, an agreement for the sale of CGIC's stock to AmTrust Financial Group, Inc. ("AmTrust") was contemplated and the receivership was deemed necessary to effectuate that sale. Prior to the sale be-

ing consummated, Mr. Lucia negotiated a non-compete agreement between himself and AmTrust which provided for payments to Mr. Lucia of $20,000 per month beginning in October, 2000.

On or about November 22, 2000, Mr. Lucia resumed control of the Debtor. A hearing on the sale of the CGIC stock to AmTrust was scheduled for January 6, 2001. Mr. Lucia did not initially oppose the sale to AmTrust, although it involved the sale of an asset of the Debtor, the stock in CGIC.

On October 31, 2000, Firstar filed an involuntary petition under chapter 11 of the Bankruptcy Code against the Debtor. On November 22, 2000, the Debtor filed a Motion to Dismiss the involuntary petition in which it asserted that the Debtor has more than twelve creditors and therefore the petition had to be filed by three creditors. Firstar disputed that assertion. On December 18, 2000, Allstate joined in the involuntary petition.

On December 26, 2000, the ODI filed an emergency motion for a determination that the automatic stay did not apply to its action to sell the assets and stock of CGIC. That Motion was opposed by Allstate, Firstar, and the Debtor. In addition, Allstate filed an emergency motion for the appointment of a trustee, in which it asserted that the Debtor was allowing the ODI to sell an asset of the Debtor (the stock in CGIC) without compensating the Debtor or its creditors. After a hearing held on January 3, 2001, we granted the ODI's Motion[3] and scheduled an evidentia-

---

matters by Federal Rule of Bankruptcy Procedure 9014.

**2.** The assets allegedly transferred included renewal rights, tax refunds, bank accounts, trust fund accounts, and a computer system and software.

**3.** We determined that the McCarron–Ferguson Act preempted the Bankruptcy Code and consequently the automatic stay was not applicable to the Ohio proceedings because they involved the regulation of an insurance company. *See, e.g., U.S. v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). *See also* 15 U.S.C. § 1012(b)("No Act of Congress

ry hearing on the Trustee Motion. Subsequently, the sale to AmTrust did not proceed in the Ohio state court; apparently it was withdrawn by the ODI.

On January 19, 2001, an order for relief was entered against the Debtor, by consent. A hearing on the Trustee Motion (which was amended by Allstate on January 23, 2001) was held on February 12, 2001.

## II. JURISDICTION

This Court has jurisdiction over this Motion, which is a core proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A) and (O).

## III. DISCUSSION

Section 1104 of the Bankruptcy Code provides the standards for appointment of a trustee in a chapter 11 case:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause ... or—

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate. . . .

11 U.S.C. § 1104(a).

 The party seeking appointment of a trustee has the burden of establishing

the need for such appointment by clear and convincing evidence. *See, e.g., In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir.1998)(strong presumption against appointment of trustee is based on debtor's familiarity with its business and its obligation to act as a fiduciary for its creditors); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir.1989) (the appointment of a trustee in a chapter 11 case "should be the exception, rather than the rule"). However, once "cause" is shown, the court must appoint a trustee. *See, e.g., Marvel*, 140 F.3d at 472; *Sharon Steel*, 871 F.2d at 1226.

Allstate asserts that cause exists for the appointment of a trustee because Mr. Lucia has diverted assets of the Debtor and its subsidiaries and has permitted the ODI to strip assets from the Debtor and subsidiaries of the Debtor for the benefit of CGIC and its creditors.

### A. Motion to Seal

As a preliminary matter, we must address the Debtor's Motion for Emergency Relief. While that Motion seeks to seal Allstate's Memorandum of Law, it really asks us to seal the attachments to the Memorandum which consist of a preliminary and final report prepared by Ms. Victoria Hradisky. In presenting its case in support of the Trustee Motion, Allstate relies heavily on the Hradisky report.

Ms. Hradisky was an employee of the Debtor and/or CGIC.[4] She testified that, after the ODI took supervisory control of CGIC, she was advised by Mr. Boyko (then president of the Debtor and/or

___

shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance").

4. Although Ms. Hradisky testified that she was an employee of the Debtor, her paychecks apparently came from its subsidiaries, CGIC and Phoenix Management Enterprises, Inc. ("PME").

CGIC) that the ODI was conducting an investigation of allegations of diversion of funds from CGIC to Mr. Lucia. Mr. Boyko stated that the Debtor wanted to conduct its own internal investigation. Ms. Hradisky accordingly conducted an investigation and prepared her preliminary and final reports for the Debtor.

The Debtor asserts that the Hradisky report should be sealed because (a) it is part of the Ohio rehabilitation proceeding which Ohio law provides is confidential, and (b) Allstate obtained that report under a confidentiality agreement with the Debtor. Allstate disputes those assertions. Allstate alleges it obtained the Hradisky report not from the Debtor but from the ODI, pursuant to a subpoena. Further, Allstate asserts that the Ohio statute is inapplicable because the report, rather than being work papers of the Supervisor, are the Debtor's records.

We agree with Allstate. The Ohio statute provides that "[t]he work papers of the superintendent or of the person appointed by the superintendent, resulting from the conduct of an examination" of an insurance company are confidential. Ohio Rev.Code § 3901.07. The Hradisky report is not the work papers of the ODI. Rather, according to the testimony of Ms. Hradisky, the report is the result of an internal investigation by the Debtor, independent of the investigation conducted by the ODI. The ODI apparently agrees since it made no effort to obtain a protective order and produced the report in response to Allstate's subpoena.

Further, we conclude that there is no business reason to seal the record. The Debtor has no business operations, nor does the report provide any details about the Debtor or its subsidiaries' business operations that is of a confidential nature, such as a trade secret. The Bankruptcy Code is designed to bring the Debt-

or's affairs to light, not to hide them. *See, e.g.,* 11 U.S.C. § 107; Fed. R. Bankr.P. 2004. *See also In re Continental Airlines, Inc.,* 150 B.R. 334 (D.Del.1993) (bankruptcy court's decision to place fee examiner's report under seal was abuse of discretion).

Accordingly, we deny the Debtor's motion to place the Hradisky report under seal.

### B. *Diversion of Funds*

Diversion of funds and misuse of corporate assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)(1). *See, e.g., In re Bibo, Inc.,* 76 F.3d 256, 257–58 (9th Cir.1996)(appointment of a trustee was mandated where management had siphoned funds from the debtor through kickbacks); *Sharon Steel,* 871 F.2d at 1228 (systematic syphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of trustee); *In re Professional Accountants Referral Svcs., Inc.,* 142 B.R. 424, 428–29 (Bankr.D.Colo.1992)(diversion of corporate assets for professional use constitutes dishonesty or gross mismanagement which required the appointment of a trustee); *In re Colby Constr. Corp.,* 51 B.R. 113, 116 (Bankr.S.D.N.Y.1985)(majority shareholder's "deliberate and unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section").

Allstate asserts that a trustee is necessary because the Debtor is controlled by Mr. Lucia, against whom the Debtor has significant causes of action for diversion of funds. That assertion is based largely upon the Hradisky report, which evidences significant diversion of assets

from CGIC through other corporations to Mr. Lucia, personally.

During the supervision of CGIC, the Debtor through Ms. Hradisky conducted an internal investigation of alleged transfers of assets from CGIC during the period from 1994 to 2000.[5] Ms. Hradisky produced a preliminary and final report detailing the deposit of approximately $32 million of checks made payable to CGIC into accounts held in the name of Phoenix Trust, Ambrit Indemnity Company Ltd., and PT Inc.[6] That report also concluded that almost $3.5 million was transferred from those accounts to pay personal expenses of Mr. Lucia. Those expenses included almost $1.4 million to purchase or construct Mr. Lucia's homes; $150,000 for his daughter's wedding; $90,000 for his wife; and $70,000 for his children's tuition. (Exhibits P–2 & P–7).

With respect to the transfer of funds from CGIC to the other companies, there was little evidence presented by the Debtor to explain those transfers. Mr. Pipoly attacked the Hradisky report by raising questions about her methodology. Mr. Pipoly testified that the report ignored the opening balances in the accounts and assumed that there was no legitimate basis for the deposit of CGIC checks directly into the accounts of Phoenix Trust, Ambrit or PT. He said that it was not unusual for CGIC to deposit its checks into others' accounts. He suggested there might be legitimate reasons for those transfers, such as if there were a reinsurance contract or other relationship between the companies.

With respect to the transfers to Ambrit, Mr. Pipoly suggested that there was just such a reinsurance agreement. As evidence of this, he referred to an entry in the Ambrit general ledger from the early 1990s. However, no contracts between the parties establishing such a relationship were presented. In fact, Mr. Pipoly admitted that he never saw such a contract in the eight years he was with the Debtor. Further, the CGIC financial statements (for which he was responsible) stated that CGIC had reinsurance agreements only with domestic companies. Since Ambrit is an off-shore reinsurance company, this contradicts Mr. Pipoly's suggestion that there was such a relationship.

Mr. Pipoly also presented no evidence of any legitimate basis for the deposit of CGIC's checks into Phoenix Trust's accounts. Although he was the controller, and was aware that Phoenix Trust had separate bank accounts and was paying some of CGIC's claims, he never saw the Phoenix Trust bank statements. He apparently made no attempt, during the time CGIC funds were transferred to Phoenix Trust, to obtain any explanation or accounting for those transfers.

While Mr. Lucia testified at the hearing on the Trustee Motion, on advice of his counsel, he refused to answer any questions about the Hradisky report. Consequently, he did not provide any explanation for the alleged payment of his personal expenses by CGIC. Mr. Pipoly had no relevant information about this issue because he never asked Mr. Lucia for an explanation. Ms. Hradisky testified that, while conducting her investigation and preparing her report, she asked senior management of the Debtor and CGIC, including Mr. Pipoly, to provide all infor-

5. The Debtor reviewed those years because it only had six years of bank statements.

6. Ambrit is an offshore reinsurance company; Mr. Lucia is a 25% shareholder of Ambrit.

According to Mr. Pipoly, prior to 1996, Phoenix Trust was a shareholder of the Debtor; Mr. Lucia is the sole shareholder and beneficiary of Phoenix Trust.

mation they had about the legitimacy of any of the transfers. None was forthcoming.

In oral argument, the Debtor's counsel suggested that the payment of Mr. Lucia's personal expenses may have been justified as a bonus under his employment contract. (Exhibit P–17). Although the employment agreement does provide for bonuses to Mr. Lucia based on the Debtor's pre-tax earnings, the Debtor provided no evidence that it had any pre-tax earnings during the years in question or any accounting of what bonus, if any, was due to Mr. Lucia. Nor was there any evidence that, in fact, the transfers in question were made to satisfy any bonus due to him.

The Debtor asserts that we should not appoint a chapter 11 trustee merely because Mr. Lucia is asserting his constitutional right under the Fifth Amendment not to testify against himself. We are not. Rather, we conclude that a chapter 11 trustee must be appointed because the Debtor has provided no explanation for the diversion of funds from the Debtor's subsidiaries. The Debtor's inability to explain the diversion of assets is evidence, at a minimum, of its incompetence or gross mismanagement and, at the most, evidence of actual fraud. *See, e.g., Intercat, Inc.,* 247 B.R. 911, 923 (Bankr.S.D.Ga.2000) (diversion of substantial corporate assets to the debtor's management or to other corporations owned by management constituted mismanagement at best and fraud or dishonesty at worse; either warrants appointment of a trustee); *Colby,* 51 B.R. at 117 (gross mismanagement under section 1104 existed where the debtor's accounting system failed to reflect its financial condition and the books and records were in a shambles); *In re Philadelphia Athletic Club, Inc.,* 15 B.R. 60, 63 (Bankr.E.D.Pa.1981)(debtor's failure to keep adequate records and commingling of assets with its parent required the appointment of a trustee).

In this case, the Hradisky report presents compelling evidence that funds of CGIC, the Debtor's wholly owned subsidiary, were diverted. Ultimately, a portion of the diverted funds went to Mr. Lucia through the payment of personal expenses. We do not find credible the Debtor's suggestion—with no evidence to support it—that there might be legitimate reasons for that diversion. The Vice President/Controller of the Debtor, who was responsible for the preparation of the Debtor's financial statements and records, should have been able to present concrete evidence to explain the transfers. To refute the evidence presented in support of the Trustee Motion, it is not sufficient for the Debtor to present mere speculation as to the legitimate basis for the transfers. The Debtor (and Mr. Lucia) are in the unique position of being able to explain the basis for the transfers; the creditors are not. If Mr. Lucia is not willing or able to provide an explanation, then the Debtor must. If there is a contractual relationship justifying the transfers, surely the Debtor's controller should be able to explain what it is. In the absence of such an explanation, we must conclude that either there is not a legitimate one or that the Debtor is incompetent. Either mandates the appointment of a chapter 11 trustee in this case.

### C. *Causes of Action Against Insiders*

■ Because of the evidence of significant transfers of assets to Mr. Lucia and his family, we conclude that an independent basis for the appointment of a trustee exists. It is unrealistic to assume that the Debtor, if controlled by Mr. Lucia, will authorize or even cooperate in the investigation and prosecution of such actions. The testimony of Mr. Pipoly illustrates this. When confronted with the Hradisky

report evidencing over $3.5 million in transfers to Mr. Lucia and his family, Mr. Pipoly did not pursue an investigation of those transfers. He did not even ask Mr. Lucia for an explanation.

The prosecution of such actions is one of the only significant assets that the Debtor has. The Debtor has no business operations; its subsidiaries are apparently insolvent. The only assets of the Debtor appear to be tax refunds, actions against the ODI and actions against the recipients of the diverted funds.[7]

The Debtor concedes that to the extent that it has a cause of action against Mr. Lucia (and his family) to recover some or all of the transfers, it may not be in a position to pursue that action. Instead the Debtor asserts that any action against Mr. Lucia could be pursued by the creditors. *See, e.g., Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 251 (5th Cir.1988)(allowing creditors' committee to prosecute action against insiders where debtor refuses to pursue action itself will benefit the estate); *In re Philadelphia Light Supply Co.,* 39 B.R. 51, 52 (Bankr. E.D.Pa.1984)("In cases in which the debtor in possession is conducting its affairs without objection but for its failure to prosecute a handful of claims against insiders, granting leave to the creditors' committee to pursue these actions may be less expensive than the appointment of a trustee").

Such a solution is not feasible in this case. There is no creditors' committee appointed in this case; the twenty largest creditors' list includes numerous insiders, including Mr. Lucia and Mr. Pipoly. Further, the Debtor has no business operations; the appointment of a trustee, therefore, can have no disruptive effect.

Consequently, we conclude that following the cumbersome (and lengthy) procedure of allowing the creditors' committee, if one is ever appointed in this case, to pursue actions against insiders is not in the best interests of creditors in this case. In *In re Fiesta Homes of Georgia Inc.,* the Court reached a similar conclusion on similar facts:

> The Debtor has argued that the parties have a right to seek the appointment of a trustee at a later time if it is determined that the preference actions were not vigorously prosecuted. However, since this is a liquidation case and litigation of the preferences is essentially all that is left to do, there is no need to balance the propriety of the appointment of a trustee with the present management's ability to run the company. There are no duties to perform aside from those which the present management is least likely to want to perform. Moreover, the cost to creditors to monitor management would be very difficult to assess.... Section 1104 authorizes appointment of a trustee if such appointment is in the "interest of creditors." I find that such appointment, in light of the existing conflict of interest of management is clearly in the best interest of creditors. I therefore conclude that a trustee should be substituted to administer the liquidation of Debtor.

*Fiesta Homes,* 125 B.R. 321, 326 (Bankr. S.D.Ga.1990).

Even in a case where the debtor had ongoing operations (*Sharon Steel*), the Third Circuit concluded that allowing the creditors' committee to pursue claims against insiders might not be an adequate solution:

---

7. Interestingly, when asked what the Debtor's assets were, Mr. Pipoly did not even mention possible actions against Mr. Lucia and his family or the companies to whom funds were diverted.

Sharon's management appears to have engaged on the eve of bankruptcy in a systematic syphoning of Sharon's assets to other companies under common control. Despite DWG and Posner's contention to the contrary, such behavior raises grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to Sharon's creditors. Judicial intervention enabling the committee to sue for recovery of per se voidable preferences and fraudulent conveyances may have solved that isolated management problem, but it has not cleared up the question about current management's fitness to continue running Sharon Steel and its commitment to see it through to a successful reorganization.

871 F.2d at 1228. *See also In re Oklahoma Refining Co.,* 838 F.2d 1133, 1135–36 (10th Cir.1988)(appointment of a trustee was required where the debtor may have to sue its affiliates for accounts receivable due); *Intercat,* 247 B.R. at 922–23 (failure of an insider to voluntarily rescind transfers made by debtor to him, his family and other corporations owned by him or to convince the court that he would pursue an aggressive independent investigation or prosecution of litigation to recover those transactions mandated the appointment of trustee); *In re Microwave Products of America, Inc.,* 102 B.R. 666, 676 (Bankr.W.D.Tenn.1989)(debtor's failure to investigate potential avoidable transfers to insiders "weigh heavily in favor of appointing a trustee").

Since the causes of action against insiders is such a significant asset of this estate and since there are no business operations requiring current management, we conclude that the appointment of a trustee to pursue those actions is warranted and in the best interests of creditors. 11 U.S.C. § 1104(a)(2).

### D. *Failure to Oppose Actions by ODI*

Allstate also asserts that appointment of a trustee is mandated because of the gross mismanagement of the Debtor by current management in allowing the ODI to confiscate assets of other subsidiaries for the benefit of CGIC. Allstate alleges that management led by Mr. Lucia failed both pre-petition and post-petition to have the Debtor oppose the actions of the ODI which caused significant harm to the Debtor. Those actions included the transfer to CGIC of assets of subsidiaries of the Debtor for less than fair value, the attempted sale of CGIC stock owned by the Debtor to AmTrust, the confiscation of tax refunds due to the Debtor, and the seizure of the books and records and offices of the Debtor by the ODI.

Allstate offered the consents of the Debtor to the various actions of the ODI as proof of the failure of Mr. Lucia to act in the best interests of the Debtor. (Exhibits P–8 through P–11). Allstate asserts that rather than protect the assets of the Debtor, Mr. Lucia permitted the ODI to strip assets from the subsidiaries of the Debtor and transfer them to CGIC in order to enhance the value of CGIC. Mr. Lucia permitted this to occur, Allstate argues, because he had a personal pecuniary interest in assuring that the purchase of CGIC by AmTrust was consummated, since he had signed a non-compete with AmTrust by which he was to receive $20,000 per month.

Mr. Lucia responded that he acted in the best interests of the Debtor and that the actions of the ODI all occurred while he was not in control. He blames the Debtor's failure to act on prior management and asserts that he is the best person to represent the Debtor's interests since he has familiarity with the Debtor's operations, from the ten years he ran its

business. He presented, as evidence of his current efforts, motions which he caused the Debtor to file in the Ohio action opposing the ODI sales efforts and seeking recovery of the assets wrongfully transferred to CGIC. (Exhibits D–3 through D–7).

We do not find credible Mr. Lucia's assertions that the Debtor's prior management (which controlled it between June and November, 2000) are solely responsible for the Debtor's predicament. Mr. Lucia ran the company for almost ten years before the ODI took over CGIC, among allegations that Mr. Lucia had stripped it of assets. Further, although Mr. Lucia regained control of the Debtor in November, 2000, he did not take any action to oppose the ODI until late December, 2000, about the time the Trustee Motion was filed.

Further, we are not convinced that having the Debtor represented in the Ohio action by Mr. Lucia is in the best interests of the estate. Mr. Lucia apparently was involved in the negotiations of the sale to AmTrust. In addition, he apparently supported the sale, possibly for his personal pecuniary reasons. Further, his inability to testify about the transfers from CGIC to Ambrit, Phoenix Trust and PT, Inc., clearly affects his ability to represent the Debtor in the Ohio proceeding. We conclude that it is preferable to have an independent representative of the estate investigate what occurred during the ODI supervision and bring the appropriate actions against all the appropriate parties.

In opposing the appointment of a trustee, Mr. Lucia and Mr. Pipoly both testified that a third party would have difficulty collecting accounts receivable and pursuing causes of action. They assert the business of the Debtor is so complicated that it would be difficult for a third party to understand the complexities of the business and even determine what is due to the Debtor. Rather than convince us of their indispensability, this argument reinforces our conclusion that a trustee is mandated here. Their testimony confirms that the Debtor's affairs were not conducted in a legitimate manner; if they were, the Debtor's books and records should be sufficiently clear to allow a third party to determine what is due the Debtor. The fact that the records are impossible to fathom certainly does not convince the Court that the parties who maintained the records in that manner, the president and controller, should be allowed to continue to control the Debtor.

Further, Mr. Lucia's offer to step aside and allow Mr. Pipoly to control the Debtor is not an acceptable solution. Mr. Lucia's statement that he is "able to work with Mr. Pipoly" coupled with the fact that Mr. Pipoly did nothing to investigate the transfers to Mr. Lucia, convinces us that he is not the independent fiduciary for the creditors that is warranted in this chapter 11 case. In addition, Mr. Pipoly cannot adequately pursue the estate's actions against the ODI because he was a member of the Debtor's management at the time when the ODI caused the transfers to occur. Although he testified that he opposed the ODI actions, this may be a contested issue. In fact, Mr. Lucia himself accused Mr. Pipoly of improper actions during the time the ODI was in control, asserting that Mr. Pipoly had improperly influenced bidders in the efforts to sell the CGIC assets. (Exhibits P–14 & P–15). Although Mr. Lucia testified that he was wrong in that belief, we conclude that this is an area where investigation by a third party is warranted.

## IV. CONCLUSION

For the reasons stated above, we conclude that the appointment of a trustee is

mandated under section 1104(a) of the Bankruptcy Code because of the possibility of fraud and gross mismanagement of the Debtor by current management and the inability of current management to investigate and prosecute potential causes of action held by the Debtor.[8]

An appropriate order is attached.

### ORDER

AND NOW, this **23RD** day of **FEBRUARY, 2001,** upon consideration of the Amended Motion for Appointment of Interim Trustee filed by Allstate Life Insurance Company, and the joinder of Firstar Bank, N.A. thereto, it is hereby

**ORDERED** that the Amended Motion is **GRANTED**; and it is further

**ORDERED** that the United States Trustee's Office is hereby **DIRECTED** to appoint a chapter 11 trustee for the above Debtor's estate; and it is further

**ORDERED** that a status hearing be held in this case on March 19, 2001, at 4:00 p.m.

---

8. As a result of our decision, we have scheduled a status hearing on this case for March 19, 2001, at 4:00 p.m., to address the applications for retention of counsel and special counsel filed by the Debtor.