In re NORTH AMERICAN COMMUNICATIONS, INC., Debtor.

CHESAPEAKE R & D LIMITED PARTNERSHIP, Movant,

v.

NORTH AMERICAN COMMUNICATIONS, INC., Respondent.

Bankruptcy No. 91–3794–BM.
Motion No. 91–8368M.

United States Bankruptcy Court, W.D. Pennsylvania.

March 19, 1992.

---

**7.** AI took expressly took this position in its letter to Metropolitan dated September 21, 1989. See

n. 2 *supra.*

**176**

Robert G. Sable, Stephen J. Laidhold, Sable, Makoroff & Gusky, P.C., Pittsburgh, Pa., for debtor.

William F. Ward, Kevin C. Hansen, Meyer, Unkovic & Scott, Pittsburgh, Pa., for Chesapeake R & D Ltd. Partnership.

Joseph F. McDonough, Manion, McDonough & Lucas, P.C., Pittsburgh, Pa., for Committee of Unsecured Creditors.

Paul D. Scott, Trial Atty., U.S. Dept. of Justice, Commercial Litigation, Washington, D.C., for U.S.

Stephen I. Goldring, Office of United States Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is a *Motion For Appointment Of Chapter 11 Trustee Or, In The Alternative, For The Appointment Of An Examiner And For Placement Of Restrictions On Management* filed by Chesapeake R & D Limited Partnership ("Chesapeake"). According to Chesapeake, the present management of North American Communications, Inc. ("debtor") has engaged in fraud and dishonesty, has been incompetent, and has grossly mismanaged debtor's business affairs. It further maintains that appointment of a trustee or an examiner would be in the best interest of creditors and of the bankruptcy estate in general.

Debtor opposes the motion and denies the allegations made by Chesapeake.

The motion will be granted and a trustee will be appointed. However, the trustee's powers will be limited to managing matters pertaining to the expenditure of estate assets and to bringing any actions for gross mismanagement against debtor's present management which the trustee deems to be warranted. The trustee will *not* be empowered to manage those aspects of debtor's operations pertaining to sales or to the operation of its production and distribution facility. Such matters are to remain under the control of debtor's present management, which is to remain as debtor-in-possession in all other respects.

### I

### FACTS

Debtor is a closely-held Pennsylvania corporation which employs approximately 450 individuals and which produces and distributes direct mass mailings from its facility in Duncansville, Pennsylvania. Debtor avers that its common stock is owned by Robert Paltrow (46%), Michael Herman (46%), and William Bradley (8%).

Robert Paltrow ("Paltrow") is debtor's president. He is responsible for developing, servicing, and maintaining many of debtor's largest and most important ac-

counts. The accounts which he personally services and maintains constitute approximately forty percent (40%) of debtor's gross annual sales and generated approximately $12,000,000 in revenues last year. Paltrow also supervises debtor's entire sales force and accounting staff, provides all price quotations and estimates for prospective projects, and manages all employees at debtor's subsidiary located in California.

Michael Herman ("Herman") is debtor's vice-president. His primary responsibility is managing daily production and distribution activities at debtor's facility in Duncansville, Pennsylvania. All department heads report directly to him. Herman is also involved in servicing some of debtor's accounts.

William Bradley ("Bradley") has had no involvement with debtor since 1987. He now owns another mass mailing distributor which is in direct competition with debtor.

Chesapeake is a creditor of debtor and an equity security holder. An arbitrator determined in July of 1991 that debtor had breached an agreement with Chesapeake and awarded Chesapeake $891,000 in damages. The award subsequently was affirmed by the Circuit Court of Richmond, Virginia, where judgment was entered in favor of Chesapeake and against debtor in the amount of $1,229,777.40.

Debtor's gross sales have increased from $17,800,000 for the fiscal year ending January 31, 1987 to $32,300,000 for the fiscal year ending January 31, 1992.[1] Although debtor showed a modest net gain for fiscal years 1987 and 1988, it suffered net losses totaling approximately $1,000,000 for fiscal years 1989 through 1991.

Between January 31, 1987 and January 31, 1991, Paltrow and Herman received salaries from debtor totaling $2,344,820. Between January 1, 1991 and December 31, 1991, Paltrow was paid $782,683.06 in compensation and Herman received $611,-357.51. These amounts were more than twice what they had been paid during the previous year. Subsequent to the filing of

debtor's bankruptcy petition, Paltrow and Herman voluntarily reduced their salaries to $420,000 for each of them.

Paltrow and Herman have borrowed substantial sums of money from debtor without executing any promissory notes, without providing any security or collateral, without any repayment schedule, and without paying any interest. The loans to them by debtor were authorized by Paltrow and Herman themselves. They borrowed a total of $319,610 during fiscal year 1987, a total of $440,702 during fiscal year 1990, and a total of $327,417 during fiscal year 1991.

Paltrow still owes debtor $271,650 and Herman still owes debtor $55,767 on these loans. Neither of them has ever repaid the loans with cash. Rather, Paltrow and Herman simply granted themselves substantial bonuses which were then set off against the loans on debtor's books. In January of 1991, Paltrow and Herman granted themselves bonuses totalling some $300,000.

Paltrow and Herman also have been reimbursed over $900,000 by debtor for alleged travel and entertainment expenses. Paltrow was reimbursed a total of $453,906 for fiscal years 1987 through 1991. Herman was reimbursed a total of $451,500 during that same period. Paltrow simply wrote checks to himself on debtor's account to cover his expenses. Herman would tell debtor's controller the amount of his expenses, who would then issue a check in the amount payable to Herman.

Debtor purchased a yacht in June of 1987 and has expended over $1,000,000 on it since the date of purchase. No books or records were kept by debtor to reflect when the yacht was used for business purposes and when it was used for personal reasons. Paltrow and Herman were aware of only one (1) occasion when the yacht was used to entertain debtor's clients.

Debtor also owned an aircraft between June of 1988 and September of 1989. After September of 1989, debtor leased aircraft from various companies, including

---

1. Debtor's fiscal year ends on January 31st of each year. All references in this Memorandum Opinion to debtor's fiscal year refer to the fiscal year which ends on January 31st of that year.

one owned by Herman. No books or records were kept to reflect whether the aircraft were used on a given occasion for business or personal reasons. Between January 31, 1987 and January 31, 1991, debtor incurred $991,391 in airplane expenses.

Debtor also utilized its own funds to purchase several expensive motor vehicles for Paltrow and Herman and for members of their families. It purchased a Range Rover and a Porsche for Paltrow and an Audi for Herman. No books or records were kept to reflect whether these vehicles were used for business or personal reasons. In addition, debtor purchased a Cadillac for Herman's ex-wife and a Cadillac for his mother, neither of whom ever worked for debtor or performed any services on its behalf.

Debtor also played a vital role at the behest of Paltrow and Herman in creating seventeen (17) affiliated companies. Paltrow and Herman control the affiliates and either own a majority of the stock in each company or are entitled to receive a majority of the stock if they so choose. Debtor neither owns any of the stock in these affiliates nor has the right to acquire it. Debtor has provided accounting and tax services, without charge, to several of the affiliates. In addition, debtor has loaned approximately $6,400,000 of its own funds to these affiliates since 1986, without any promissory notes, without any security or collateral, without any repayment schedules, and without any interest. The loan balance as of January 31, 1991 was approximately $1,700,000. At least $1,000,000 in bad loans has been written off by debtor since 1988. Also, debtor has written off as an uncollectible approximately $868,000 in accounts receivable from these affiliates.

## II

### ANALYSIS

Appointment of a chapter 11 trustee is governed by 11 U.S.C. § 1104(a), which provides as follows:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Chapter 11 is designed to allow a debtor to manage its own business affairs unless a party-in-interest can show that appointment of a trustee to manage debtor's affairs is warranted. *In re Parker Grande Development, Inc.*, 64 B.R. 557, 560 (Bankr.S.D.Ind.1986). As a result, appointment of a chapter 11 trustee should be the exception rather than the rule. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir.1990).

Although subsection (a)(1) *mandates* appointment of a trustee when "cause" to do so is present, the determination that such cause exists lies within the sound discretion of the bankruptcy court. *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 242 (4th Cir.1987). Incompetence and gross mismanagement are the most common grounds for appointment of a trustee under this subsection. *In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr.W.D.Pa.1988), *aff'd*, 871 F.2d at 1217 (3d Cir.1990).

Subsection (a)(2) creates a flexible standard which allows for appointment of a trustee, even though "cause" does not exist, when so doing would serve the interests of creditors and the estate. *In re Sharon Steel*, 871 F.2d at 1226. Factors which justify appointment of a trustee under this subsection are highly diverse and

in essence reflect the practical reality that a trustee is needed to manage the debtor's affairs. *In re Sharon Steel,* 86 B.R. at 458.

■ The burden is upon the moving party to prove the need for a trustee by clear and convincing evidence. *In re Sharon Steel,* 871 F.2d at 1226.

Were this debtor not in bankruptcy, the conduct of its present management might not be subject to such critical scrutiny. Things are different, however, now that debtor seeks protection in this court and the interests of its creditors are to be accorded a higher priority.

■ Appointment of a trustee is warranted in this case. The above facts clearly and convincingly establish that debtor's present management has grossly mismanaged its affairs and establish that such an appointment would be in the best interest of creditors and of the bankruptcy estate in general.

For example, Paltrow and Herman received nearly $1,400,000 in compensation during 1991, which is more than twice what they had received during the prior year. Their generosity to themselves is excessive in light of the fact that debtor suffered net losses exceeding one million dollars for fiscal years 1989 through 1991.

Also, the manner in which Paltrow and Herman directed that debtor "lend" them substantial sums of money and the means by which the loans were "repaid" is indicative of their gross mismanagement. The loans were made without any promissory notes, without any security or collateral, without any repayment schedule, and were interest-free. The manner in which the loans ostensibly were repaid is also indicative of their gross mismanagement. Paltrow and Herman simply directed that they be paid substantial bonuses which were then set off on debtor's books against the amounts they owed. No cash ever changed hands. Paltrow and Herman abused their positions of power to obtain from debtor whatever they wanted. The distinction in their own minds between the corporation and themselves is blurry, perhaps even nonexistent.

The amount of reimbursement for travel and expenses—i.e., nearly $900,000—which Paltrow and Herman received from debtor between 1987 and 1991 is excessive and also indicative of their gross mismanagement. This is especially true of Herman, who received $451,400 during that period, considering that his primary responsibility was to oversee operations at debtor's facility in Duncansville, Pennsylvania. Paltrow and Herman were not required to provide any receipts in support of their alleged travel and entertainment expenses. No questions were ever asked by debtor, which automatically reimbursed them for the full amount of what they asserted were their travel and entertainment expenses.

Debtor also purchased a yacht, an airplane, and several expensive automobiles for use by Paltrow and Herman and by members of their families. In all, debtor expended in excess of two million dollars on these items during fiscal years 1987 through 1991. It is not possible to determine the extent to which these items were used by Paltrow and Herman for business purposes and the extent to which they used them for their own personal enjoyment. No books or records were ever maintained to indicate what uses were made of these items.

The manner in which Paltrow and Herman went about setting up affiliated companies at debtor's expense is also indicative of their gross mismanagement. Although debtor's assets and resources were used to establish and operate the affiliates, it has no ownership interest in them. Paltrow and Herman either own a majority of the stock of the affiliates or have the right to acquire it. They stood to gain the most in the event the affiliates flourished while debtor stood to lose the most in the event they failed. The loans debtor made to these affiliates were without promissory notes, without security or collateral, without any repayment schedule, and were interest-free. Debtor has had to write off in excess of one million dollars of these loans as uncollectible and has had to write off

approximately $868,000 in accounts receivable from the affiliates as uncollectible.

Not only does the above clearly and convincingly show gross mismanagement on the part of Paltrow and Herman, it also establishes that appointment of a trustee would be in the best interest of creditors and of the bankruptcy estate in general. It is not clear at this time whether legal action taken against Paltrow and Herman is warranted or would be successful. It is certain, however, that no such action will be taken against Paltrow and Herman as long as they are in exclusive control of debtor.

Chesapeake's motion will be granted and a trustee will be appointed pursuant to 11 U.S.C. § 1104(a). However, as has been noted, it is presumed that a chapter 11 debtor will continue to manage its own affairs. Appointment of a trustee in such cases is an exceptional remedy. The authority of the chapter 11 trustee in this case therefore will be limited to managing those aspects of debtor's affairs which were grossly mismanaged by its present management.

Although Paltrow and Herman have grossly mismanaged debtor's affairs in the ways detailed previously, their management in other respects has been commendable. Because of their efforts, debtor offers and produces in its state-of-the-art facility a sophisticated product that is attractive to several large customers. Had Paltrow and Herman not mismanaged debtor's affairs in the ways detailed previously, it is likely that debtor would be flourishing in today's marketplace because of the attractive product that it offers.

Complete ouster of Paltrow and Herman would be detrimental to creditors and to the bankruptcy estate and would be self-defeating. Their continued cooperation is crucial to any successful reorganization of debtor. Paltrow is the major force behind debtor's sophisticated sales operation. Herman is uniquely qualified to oversee the operation of what is a complex production and distribution facility. Were Paltrow and Herman to be ousted altogether from managing debtor's affairs while it is

in bankruptcy, it is highly probable that they would refuse to play any further role in debtor's rehabilitation and that debtor would have to be liquidated. Presumably no creditor, including Chesapeake, desires such a draconian outcome.

The gross mismanagement which requires that a trustee be appointed has to do almost entirely with the utilization and expenditure of debtor's assets. Paltrow and Herman therefore will be ousted only with respect to decisions pertaining to utilization and expenditure of estate assets. The trustee will have authority to manage only this aspect of debtor's affairs while it is in bankruptcy but will have no authority to manage matters pertaining to sales or to production and distribution. Such matters are to be left to present management.

Also, should the trustee conclude that legal action against Paltrow and Herman for their gross mismanagement is warranted, the trustee will have authority to take such action.

Except for the limited role to be played by the trustee which has been described in this Memorandum Opinion, debtor shall continue as debtor-in-possession and shall continue to perform all of the statutorily prescribed duties.

An appropriate Order shall be issued.

### ORDER OF COURT

AND NOW at Pittsburgh this 19th day of March, 1992, in accordance with the accompanying Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED that a trustee shall be appointed in this case pursuant to 11 U.S.C. § 1104(a).

Said trustee's authority is limited to managing those aspects of debtor's affairs pertaining to the expenditure of estate assets during this bankruptcy and to bringing legal action against present management for its gross mismanagement which the trustee deems it appropriate to bring. Debtor is to continue as debtor-in-possession in all other

respects and is to perform all other duties required of a debtor-in-possession.