**In the Matter of INTERCAT, INC., Debtor.**

**No. 99–42796.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Feb. 18, 2000.

Ms. Kathleen Horne, Savannah, Georgia, for movant.

Mr. M. Tyus Butler, Jr., Savannah, Georgia, for debtor.

## MEMORANDUM AND ORDER ON MO-TION OF MOBIL OIL CORPORA-TION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Mobil Oil Corporation ("Mobil") filed this Motion for Appointment of a Chapter 11 Trustee on November 12, 1999. After discovery the matter was tried over a three day period concluding on January 22, 2000. Based on the evidence and applicable authorities I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Intercat, Inc. ("Intercat") is a corporation founded by Regis Lippert. Lippert has a 38 year career in the petroleum refining business having previously worked with Englehard Corporation and Katalistics, Inc. He founded Intercat in November 1986. In its formative stage, he was the sole shareholder and built the company utilizing his own expertise and labor and seed capital of approximately $100,000.00 provided by his wife, Diane Lippert. Mrs. Lippert performed in-house accounting and secretarial tasks and assisted Mr. Lippert in developing and maintaining the customer base of the business.

Debtor's business is principally devoted to the manufacturing, sales, and distribution of catalysts which are employed by the oil refining industry in a process generally referred to as "fluid catalytic cracking" or "FCC." At the great risk of oversimplification, FCC is the primary process whereby crude oil is converted into transportation fuels of various grades. In the refining process, crude oil is cooked or boiled to create steam which is then condensed into liquid form. The result of the process of condensation is the recovery of gasoline and other transportation fuels, but only about 20% of gasoline is recov-

ered from crude oil through this method. To recover a higher percentage of gasoline it is necessary to vaporize the crude oil at 450° to 1,300° and add a catalyst, zeolite, which "cracks" the molecules of vaporized crude oil into components which are then condensed by cooling. Depending upon the temperature level at which condensation occurs, the by-product can either be automobile gasoline, diesel fuel, jet fuel, or other products such as polypropylene and asphalt. Approximately fifty percent of all gasoline burned in the United States comes as a direct result of the FCC process.

Central to the contentions in this case are transactions involving a number of patents which are connected to the FCC process: (1) The "additive feed system" patent—a mechanical process by which some of the additives used in the FCC process are manufactured; (2) An anionic clay patent; and (3) A zeolite patent. All the patents are valuable in the FCC industry. Each of these patents was developed by Lippert or other employees of the Debtor, utilizing the resources of Debtor. The royalty rights to these patents are now held directly or beneficially by Mr. Lippert personally. In addition to these patents, Debtor has paid royalties to other patent holders, notably W.R. Grace and Mobil Oil, for licenses to use products patented by those companies.

The Debtor began, like many American success stories, with little more than the ingenuity, hard work, and minimal capital which its owners, Mr. Lippert and his wife, could devote to it. Over a period of approximately 10 years Debtor became tremendously profitable. Mr. Lippert, in particular, was paid handsomely for his services to the corporation as president and chief executive officer.

In the mid–1990's W.R. Grace instituted an action alleging patent infringement against the Debtor corporation. Litigation consumed several years and ultimately the United States District Court for the District of Delaware determined, by order

dated September 8, 1997, that Intercat had willfully infringed Grace's patent. *W.R. Grace & Co.–Conn. v. Intercat, Inc.*, 7 F.Supp.2d 425 (D.Del.1997). That Court held, in relevant part, that certain of Mr. Lippert's contentions during the litigation lacked credibility, that Intercat did not act reasonably and prudently to avoid infringement of Grace's patent rights, that Intercat deliberately copied the invention of the patents in suit, and that Lippert, the president of Intercat, plainly had knowledge of Grace's patent rights. The Court then entered judgment finding liability on the part of Intercat and reserved a ruling on damages. *Id.* at 472–77. The liability finding was appealed to the United States Court of Appeals for the Federal Circuit which ruled, in an unpublished opinion on June 26, 1998, that there was no reversible error and the judgment was affirmed. *W.R. Grace & Co. v. Intercat, Inc.*, 155 F.3d 572 (Fed.Cir.1998).

Trial of the damage issues ensued and the United States District Court for the District of Delaware ruled on August 9, 1999. In that judgment the Court awarded $7,983,286.00 plus pre-judgment interest. *W.R. Grace & Co.–Conn., Inc. v. Intercat, Inc.*, 60 F.Supp.2d 316 (D.Del.1999). The Court then awarded enhanced damages based on its finding of wilful infringement. As a result, the principal damages were doubled for a total award of $15,966,-572.00. The Court also held that the matter was an exceptional case justifying an award of attorney's fees, based on its prior holding that Intercat's defense of non-infringement was "litigation inspired." The judgment was not appealed and is now a final order. Grace contends that the total amount owed pursuant to this judgment is approximately $22 million dollars. Approximately two months after the rendering of this judgment, Debtor filed this Chapter 11 proceeding.

Mobil's Motion is based on 11 U.S.C. § 1104 which, in relevant part, provides as follows:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause ... or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

(c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

In support of its Motion Mobil points to a number of separate acts or transactions allegedly amounting to fraud, dishonesty and mismanagement or other cause under Section 1104. My specific factual findings as to each of these separate acts or transactions are as follows:

1) *The Grace Patent Infringement Judgment*

As set forth earlier, W.R. Grace & Company holds a final judgment in the amount of $22 million arising out of Debtor's willful infringement of Grace's patent rights which resulted in an award of damages, enhanced damages, pre-judgment interest and attorney's fees. In the rulings in that case the District Court found Mr. Lippert's testimony in defense of the action to be lacking in credibility. That conclusion was not merely *dictum* nor gratuitous comment, but rather formed the basis for the Court's decision finding willful infringement and enhancing the damages in the case. That finding is, at least to this Court's determination of Mr. Lippert's relationship with W.R. Grace, binding in this proceeding.

2) *Lippert's Compensation*

For the years 1996 through 1998 Lippert drew a base salary from the Debtor of $300,000.00. During the same period of time he took substantial payments from the Debtor, initially characterized as loans. In each case, however, the loans were later rebooked and shown as salary. In 1995 and 1996 the books of the company showed due from officers $212,000.00 and $239,000.00 respectively, but there was no direct proof that all of those loans were made to Mr. Lippert. On the other hand, he did not contend that any other officer was the recipient of such loans. What is clear is that in 1997 the total amount of loans he received amounted to at least $170,000.00 and in 1998 the total amounted to at least $50,000.00.[1] During these two years the company showed losses on its books after taxes and non-cash items of $750,000.00 and $3.8 million respectively. The latter included a $4 million reserve for potential liability in the litigation with W.R. Grace. In 1997 the company's independent auditors questioned the ability of the company to survive as a going concern. (T., Jan. 14, pp. 25–27, 71; O'Donnell Dep. pp. 62–63, 130).

In addition to salary and loans, the Debtor paid numerous bills of a personal nature which Mr. Lippert charged to the company's American Express credit card. Total charges to the American Express card in 1997 were approximately $789,000.00 and in 1998 approximately $523,000.00. However, it was not established how much of those charges were personal expenses of Mr. Lippert. In fact, it is not disputed that the American Express card is utilized by the company generally for the payment of travel and entertainment expenses of its officers and its sales force. Due to the nature of the Debtor's business its sales occur internationally, and accordingly it is not surprising that there would be large expenses incurred which would be clearly justified as ordinary business expenses.

What was established, however, is that (1) in April 1997 Mr. Lippert and his family took a vacation in the Cayman Islands, charged $27,860.00 to the company's card and did not reimburse the company for any portion of these personal expenses. (T., Jan. 14, p. 37; Exhibit 80, p. 4226). (2) In April 1998 he again traveled with his family on a purely personal vacation and incurred expenses paid solely by the company of $36,514.00. (T., Jan. 14, p. 38; Exhibit 80, p. 13959). (3) In late December 1997 extending to January 1998 he traveled to Australia with his family on a purely personal vacation and the company paid $36,000.00 in expenses which he did not repay. (T., Jan. 14, p. 39; Exhibit 41, p. 4824–25). (4) In December 1998 extending over to January 1999 he and his family made a trip to New York City which was purely personal in nature and incurred expenses in excess of $15,000.00 which he did not repay. (T., Jan. 14, p. 40; Exhibit 42, p. 15029). He made an additional trip which combined personal and business activity for which the company paid expenses of over $40,000.00, none of which he repaid. (Exhibit 39, p. 4894).

1. Lippert testified that he repaid the $50,000,00 loan. (T., Jan. 14, p. 181).

The loans which were made to Mr. Lippert were advanced on his sole authority as were his credit card charges for personal use. He only sporadically filed expense reports with the company. (T., Jan. 14, p. 74, O'Donnell Dep. pp. 57, 125–127). As a result the company paid personal expenses for him out of corporate funds, deducted them as business expenses on the company's tax returns, and Mr. Lippert, insofar as the evidence reveals, paid no tax on the benefit thus conferred on him.

3) *Payments to Lippert's wife and other members of his family;*

The Debtor pays Mr. Lippert's wife Diane a salary of approximately $50,000.00 a year. She serves as corporate secretary but generally does not attend directors or shareholders meetings and does not work full-time. While she invested her life savings in the company at inception and is an asset to the company in its efforts to maintain the personal relationships necessary to the success of the business, she performs limited day-to-day duties on behalf of the company. Cash payments were also made to Mr. Lippert's brother, a patent attorney, with the firm of White and Case, which acted as defense counsel in the Grace litigation. The Debtor owes $750,-000.00 to the firm for services rendered. In 1997 Debtor paid Lippert's 'brother $43,000.00 personally. (O'Donnell Dep. pp. 69, 147). Debtor also made a payment to Mr. Lippert's nephew for more than $30,-000.00 for legal fees despite the fact that the nephew is not a lawyer. (O'Donnell Dep. pp. 76, 149).

4) *Royalty payments to Mr. Lippert for intellectual property rights of Intercat.*

Mr. Lippert co-developed the additive feed system which Intercat utilized in the day-to-day business operations of the Debtor for approximately ten years. At some point in 1993 he filed a patent application for this invention. A patent was issued in his name in 1995. (T., Jan. 14, p. 76; Exhibit 33). In late 1997 he licensed the patent to Debtor (Exhibit 34) and during 1998 and 1999 Intercat paid royalties to Mr. Lippert on the additive feed system patent notwithstanding the fact that no royalty agreement existed when the payments initially began, that Mr. Lippert had for 10 years not charged Intercat royalties for the use of this invention and that his invention occurred at a time when he was an employee of Intercat. He received royalties on this patent during 1998 of approximately $90,000.00 and during 1999 of approximately $76,000.00 in addition to his salary, benefits and payment of personal expenses. Beginning with the years he received royalties, he did not advance himself any additional loans as he had done in 1995, 1996 and 1997. (O'Donnell Dep. pp. 131–32; T., Jan. 14, p. 82). In June 1999 on the eve of the final damage award in the Grace litigation, Mr. Lippert assigned the patent rights he had previously extracted from Intercat to Catloader L.L.C., a company owned by his wife, Diane Lippert. Catloader then licensed the rights to this invention to Intercat Equipment, Inc., a closely held company also controlled by or operated for the benefit of Mr. Lippert which is not in bankruptcy. (Exhibit 35). As a result, a non-bankrupt company is paying royalties to a company owned by Mrs. Lippert for an invention Lippert made and patented during the time he was employed by Debtor, utilizing Debtor's facilities.

5) *Royalty damage case by Mobil Oil.*

Alleged royalty payment misrepresentations made to Mobil Oil are the basis of a damage action brought by Mobil alleging damages in the amount of $6 million pending in the United States District Court for the District of New Jersey. Discovery has been completed, but trial of the action as to the Debtor has been stayed by these proceedings.

Mobil contends that discovery in the royalty litigation has revealed instances of fraud, misrepresentation, or breach of contract by the Debtor in its relationship with Mobil. The Debtor has filed a counterclaim alleging that in fact it has overpaid

royalties to Mobil Oil Corporation. The issues in the royalty proceeding are extremely complex and not capable of resolution in this proceeding. It was established, however, that one of the products on which Mobil Oil holds a patent is ZSM–5, a zeolite compound invented by Mobil which is an active component found in cracking catalysts used in the refining process. The Debtor was licensed by Mobil to use ZSM–5 in its manufacturing process and was obligated to pay royalties to Mobil based on the amount of ZSM–5 incorporated into Intercat's finished product. (T., Jan. 14, p. 129). Under the licensing agreement Debtor was obligated to make royalty reports on a quarterly basis to Mobil showing the amount of ZSM–5 included in various products manufactured by Intercat and to calculate the royalties due under the licensing agreement.

Exhibit 47 was introduced into the record (*under seal*). It is a copy of one of the typical quarterly royalty reports. Mr. Lippert acknowledges that he personally prepared the royalty reports for many years, specifically during times relevant to this Court's inquiry, including the report marked as Exhibit 47. The report shows the "total pounds" of catalyst sold by Intercat on a monthly and quarterly basis. The total pounds of product is then multiplied by two factors to determine the net amount of ZSM–5 included in the final product sold by Intercat to its customers. For example, in this instance, the total pounds of one product which contains ZSM–5 was multiplied by a factor which represented the solids content or the net amount of ZSM–5 after "loss on ignition." That subtotal was further multiplied by a factor which Lippert testified was his calculation of the percentage of ZSM–5 in the product. The net result in pounds represented the amount of ZSM–5 which Intercat reported to Mobil as being subject to a royalty assessment,[a] and on a quarterly basis Intercat remitted the amounts due under the royalty.[2]

What was not revealed on the royalty reports, however, was that the "total pounds" of catalyst sold on a quarterly basis were not actually the total, but had already been reduced in three material ways. First, any sales which Intercat made of the finished product in countries where it believed Mobil's patents had expired were eliminated from the total pounds reported. Second, total pounds reported was reduced by 15% on account of Intercat's belief that 15% of the ZSM–5 used in the manufacturing process was in fact recycled material. Third, Intercat reduced the number of pounds reported by a factor which was believed to represent lack of crystallinity of the ZSM–5 product. Again, none of these three reductions were revealed to Mobil on any quarterly report. Mobil's witness conceded that Mobil itself has no reliable test for determining the amount of ZSM–5 in a finished product, and that it had notice that Lippert believed he had the right to exclude royalties in certain foreign countries where he believed the Mobil patent rights had expired.

**2.** It is hotly disputed by the parties whether the adjustments for loss on ignition or for percentage of ZSM–5 in the product are in fact accurate. Indeed, the Debtor's expert witness, Dr. Verhilieg, has recently developed a specific methodology for testing to determine loss on ignition and percent of ZSM–5 in the final product and believes that, in fact, the Debtor has overpaid royalties to Mobil because it underestimated the reductions to which Intercat was entitled. It is this methodology and his testimony which apparently is at the basis of the Debtor's counterclaim against Mobil Oil.

Mobil disputes that methodology, developed after litigation began, as an appropriate basis on which to exculpate what it believes is the Debtor's prior misconduct. It also disputes the accuracy of the Debtor's newly developed methodology. Although the methodology of Dr. Verhilieg, if established at the trial of this case, would suggest that Mobil will recover no damages from the Debtor and may owe the Debtor money on the Debtor's counterclaim, his methodology did not exist and was not used by Lippert at the time the royalty reports were issued nor was Verhilieg consulted concerning the reasonableness of the factors which Lippert employed to calculate the various reports.

I find that the royalty reports submitted by, or at the direction of, Mr. Lippert on behalf of Intercat to Mobil were misleading at best and fraudulent at worst. The magnitude of the undisclosed under reporting was not insignificant. For example, Exhibit 51, page 6, the third quarter 1997 report, showed that 51,000 total pounds of one product actually produced was reported to Mobil as 14,000 pounds. The forensic accountant hired by Mobil testified that he found consistent under-reporting throughout the period starting in 1991 and ending in 1998 which he investigated and that the royalty reports were not fair and accurate. This testimony was not contradicted by any witness proffered on behalf of the Debtor.

### (6) *The Shareholders' Suit.*

In September 1999 an action was filed by Donald Clawsen and other employees of Intercat and related corporations naming Regis Lippert and others as defendants. The action is multifaceted, but raises allegations about many of the same transactions which form the basis of Mobil's motion to appoint a trustee. More specifically the action complains of Lippert's method of compensation for himself, of his transfer of the rights of certain intellectual property from Intercat to Bulldog Technologies, and seeks relief *inter alia* consisting of the appointment of a receiver under state law to operate the debtor corporation. The action is in its very early stages and none of the allegations have been established, although evidence tending to support some of those allegations was introduced at the trial of this matter as set forth within the four corners of this opinion. Clawsen testified that he decided to file the lawsuit when he first learned that Bulldog Technologies and Lippert were holding the patent rights which he believed properly belonged to Intercat and because of his belief that Lippert had transferred all the meaningful intellectual property of the Debtor out of the Debtor's hands. (Exhibit 65, *Donahue, Clawsen & Smith v. Lippert, Bulldog Technologies, Prism Enterprises, et al.,*

pending in the Superior Court of New Jersey, County of Mercer).

Clawsen's co-plaintiffs, Donahue and Smith, were fired almost immediately after the lawsuit was filed. Clawsen himself was suspended with pay. Because of the early stage in which the shareholders' proceeding stands, I am unable to conclude that it has any particular significance in this proceeding except to the extent that some allegations raised in that suit have also been proven in the evidentiary hearing conducted in this forum. There is one exception—the conduct of Mr. Lippert's action in immediately terminating or suspending with pay key employees of the company who were also shareholders, immediately after they filed an action alleging misconduct on Mr. Lippert's part, is questionable at best.

### (7) *Self dealing by Mr. Lippert or waste of corporate opportunities and assets of the Debtor in connection with Bulldog Technologies, Inc.*

Lippert formed Bulldog Technologies USA, Inc., in 1996 and owned all the stock in the company for some time. He subsequently assigned or transferred his stock in Bulldog to Prisma Investments, a company which he acknowledges is operated for his beneficial interest and is incorporated and operates in Aruba. (T., Jan. 14, pp. 85–86). Bulldog Technologies thereafter obtained and licensed to the Debtor certain patent rights from full time employees of Intercat whose job was to develop and invent new products. Under the terms of their employment contracts Intercat owned any inventions or patents developed by these employees. (T., Jan. 14, p. 106). Bulldog paid only a nominal consideration of $10.00 for their rights in and to the zeolite patent (Exhibit 36) and the anionic clay patent. Neither of the inventors were employed by Bulldog and the invention occurred while the employees were employed at Intercat and using its facilities. Bulldog received royalties under the license agreement from Intercat on the

zeolite product in 1998 of over $67,000.00 and in 1999 of $135,000.00. (T., Jan. 14, p. 83; Exhibit 37). For the anionic clay patents royalties were paid to Bulldog by Intercat of $38,000.00 in 1999 and an unknown amount in 1998. (T., Jan. 14, pp. 84–85).

Bulldog apparently prosecuted the issuance of the patents at some expense, and Lippert apparently contends that this additional consideration supports a finding that Bulldog paid fair value for the inventions. However, Bulldog was bankrolled by Intercat in a fairly complicated transaction in December 1996. To simplify it, Intercat–Savannah sold a product to an entity known as PMEX. The same product was sold by PMEX to Prochem and then by Prochem to Bulldog Technologies for $159,000.00. The Debtor Intercat, Inc., provided Bulldog with all of the funds to purchase the product from Prochem for $159,000.00. Bulldog Technologies then resold the product to Intercat–Savannah for $349,000.00 yielding a $190,000.00 profit to Bulldog. This profit was achieved solely through the use of funds provided by the Debtor corporation. This profit benefitted only Mr. Lippert personally as the sole shareholder of Bulldog by enabling Bulldog, with Debtor's funds, to raise working capital which was used to obtain the anionic clay and zeolite patents. These patents are the same ones assigned to Bulldog for nominal consideration and Bulldog has now collected royalties in excess of $238,000.00 over the past two years for inventions developed and patented with Intercat resources.

8) *Transfer of Software Copyrights Developed.*

Debtor also owned copyrights for certain software developed by Intercat employees, known as the Intercat Management System. In similar fashion to what occurred with patent rights, this copyright was transferred to Bulldog in 1997 for nominal consideration. (T., Jan. 14, p. 99; O'Donnell Dep. p. 104). Bulldog now collects royalty payments for the use of this software. (T., Jan. 14, pp. 99–100).

Notwithstanding the testimony of Clawsen that Lippert was contemplating retirement or departure from the company during the calendar year 1999, Lippert remains actively involved in all aspects of the company. Because he founded Intercat on a shoestring, and has built it into a $30 million company with about 60 employees at the present time, he is intimately familiar with both the product development and sales aspects of the business, continues to make decisions concerning product pricing and production, and supervises his international sales force and his financial group on a daily basis. Since the case was filed in October he believes that the company is operating on a more financially stable path. Sales are $500,000.00 above budget and accounts receivable collections are $350,000.00 above the budget anticipated at filing. This is despite the fact that the company's major spray dryer is not currently operative and is being repaired. The inability of the company to use its larger spray dryer results in loss of economies of scale and efficient scheduling and otherwise yields increased costs of operation.

Lippert contends that the company's $750,000.00 loss in 1997 and $2.5 million loss in 1998 do not reflect as dismal a performance as it would normally suggest because on an operating basis the company showed a profit in each year. However, the 1998 loss resulted because auditors required the company to show a $4 million reserve for the potential judgment by Grace. Actual damages exceeded $7 million and the amount of the judgment was enhanced to a figure which now exceeds $22 million. Thus, even the reserve which resulted in turning 1998 from a profitable year to a year when substantial losses were incurred proved to be inadequate and the financial picture of the company was far worse than shown on the books of the company. On cross examination Lippert's testimony concerning the improved operation of the business was diminished somewhat because of his acknowledgment that

the company is not having to service its pre-petition accounts payable in the post-petition period and because certain expenses are accruing, but have not yet been paid. Thus, although on a cash basis the company's position seems to have improved, the improvement is not as significant as he first testified.

## THE STATUTORY AND CASE LAW FRAMEWORK

Mobil brings its Motion under 11 U.S.C. § 1104(a)(1) which provides for the appointment of a trustee if the Court finds cause including fraud, dishonesty, incompetence, or gross mismanagement, either before or after the commencement of the case or, alternatively under Section 1104(a)(2) which calls for appointment of a trustee if such appointment is in the interest of creditors. Although Mobil contends that its Motion should be granted under either ground, it emphasizes the mandatory provisions of § 1104(a)(1) and argues that the Court has been presented with overwhelming evidence of fraud, dishonesty, incompetence, or gross mismanagement, and that appointment of a trustee is not discretionary, but is mandatory.

In opposition to the motion, the Debtor argues that the conduct which has been demonstrated in this case does not amount to fraud, dishonesty, incompetence, or gross mismanagement and as such there is no mandatory requirement that a trustee be appointed. Further, the Debtor argues that the appointment is not in the interest of creditors, as required ·by Section 1104(a)(2), because the post-petition conduct of the Debtor has been shown to be exemplary, the financial outlook of the company has improved, and that creditors and the United States Trustee can adequately control any questionable payments which might arise simply by monitoring Debtor's monthly operating reports. Debtor also contends that the removal of Mr. Lippert, who is the founder and a key employee in the company would signal the imminent demise of the company resulting in an ultimate "fire sale" liquidation which would clearly not be in the interest of creditors. Debtor is supported in this argument by The Bank of New York, N.A., trustee for bondholders secured by fixed assets of the company, which argues that a "going concern" value rather than liquidation is in creditors' interest. Likewise, Summit Gibralter, a provider of post-petition financing to the Debtor, opposes appointment of a trustee.

■ There is a strong presumption in Chapter 11 cases that the debtor-in-possession should be permitted to remain in control of the corporation absent a showing of need for the appointment of a trustee. 7 LAWRENCE KING, COLLIER ON BANKRUPTCY § 1104.02 (15th Ed.1998). It is well settled that the appointment of a trustee should be the exception rather than the rule. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3rd Cir.1989). The corporation's current management is "best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 524 (Bankr.E.D.N.Y.1989). This strong presumption is rooted in the debtor-in-possession's familiarity with the business both before and after the filing of bankruptcy. *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3rd Cir. 1998). Nevertheless in the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served.

■ Cases interpreting the scope of the provisions of Section 1104 have been ruled on by number of appellate courts, although there is no Eleventh Circuit authority in this area. A review of the appellate decisions reveals common threads. The decision whether to appoint a trustee is vested in the discretion of the bankruptcy court and will be reviewed on an abuse of discretion standard. The inquiry into whether "cause" exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or

gross mismanagement, but extends to "similar cause." Factors on which the decision whether to appoint a trustee have turned include:

1) Materiality of the misconduct;
2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
3) The existence of pre-petition voidable preferences or fraudulent transfers;
4) Unwillingness or inability of management to pursue estate causes of action;
5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
6) Self-dealing by management or waste or squandering of corporate assets.

See *Committee of Dalkon Shield Claimants v. A.H. Robins Company, Inc.*, 828 F.2d 239 (4th Cir.1987). (Debtor's conduct violated both the spirit and the letter of the bankruptcy laws. Although a finding of civil contempt would be warranted because of those actions, civil contempt was not equated with "cause" for the appointment of a trustee. "Obviously, to require the appointment of a trustee, regardless of the consequences, in the event of an act of dishonesty by the debtor, however slight or immaterial, could frustrate the purpose of the Bankruptcy Act. Section 1104(a)(1), therefore must be construed, if possible, to make it harmonious with the Act in its entirety. Such a construction requires that the courts be given discretionary authority to determine whether conduct rises to the level of 'cause.' " 828 F.2d at 242); In *In re Oklahoma Refining Company*, 838 F.2d 1133 (10th Cir.1988). (Debtor had engaged in transactions with its affiliated companies, provided higher discounts to the affiliated companies, made no effort to collect the accounts receivable owed by the affiliated companies and deposited $800,000.00 of proceeds from the sale of inventory into a bank account which the secured creditors had no control or offsetting rights over. The Court held that a history of transactions with affiliated companies could constitute "cause" for the ap-

pointment of a trustee and held that once the court ruled that cause existed under Section 1104, it had no discretion but to appoint a trustee.); In *re Sharon Steel Corporation*, 871 F.2d 1217 (3rd Cir.1989). (Current management was unable to fulfill its fiduciary duty to pursue pre-petition voidable transfers because the debtor corporation and the recipient corporations had common management and those managers had conflicting duties to the debtor and to the recipients of the voidable payments. The debtor's management, in a systematic syphoning of assets to other companies under common control on the eve of bankruptcy, raised grave questions about its ability as debtor-in-possession to act in the interest of creditors. Thus there was no abuse of discretion by the bankruptcy court in finding that cause existed for appointment of a trustee.); In *re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3rd Cir.1998) (The District Court's appointment of a trustee did not constitute an abuse of discretion when the Court found that severe acrimony between the debtor-in-possession and its creditors had risen to a level of "cause," necessitating such an appointment. In that case the facts revealed that it was not simply a matter of customary or reasonably-expected tension or friction between debtors and creditors, but acrimony that was driven by an inherent conflict of interest. The conflict arose because the debtor-in-possession was controlled by interests which also occupied the status of creditors of the holding companies that owned the debtor-in-possession.); In *re Cajun Electric Power Cooperative, Inc.*, 74 F.3d 599 (5th Cir. 1996) (adopting on rehearing the dissent at 69 F.3d 746 at 751) (Inherent conflict of interest on the part of management of an electric power cooperative justifying appointment of a trustee arose from the fact that the cooperative's board members were managers or board members of its twelve member companies, all of whom purchased their electricity from the debtor.); In *re Lowenschuss*, 171 F.3d 673 (9th Cir.1999) (Debtor's pre-petition transfer of pension plan assets, personal flight out of

state, and his continuing control over pension plan assets constituted cause for appointment of a trustee. Alternatively, debtor's history of manipulating the pension plan and his control over the pension plan's nominal trustee, his son, supported the finding that it was in the interest of creditors to have a trustee appointed.)[3]

## CONCLUSIONS OF LAW

 Having fully considered the evidence and applicable authority I conclude that Movant has demonstrated cause for appointing a trustee in this case by clear and convincing evidence.[4] (1) In its willful infringement of the patent rights of W.R. Grace, Debtor's management was guilty of dishonesty and those acts resulted in a judgment of $22 million being entered against Debtor. (2) In the payment of compensation to himself, particularly floating loans to himself and later avoiding repayment by treating the loans as salary during the same years the corporation began to sustain large financial losses Mr. Lippert mismanaged the Debtor. (3) In charging thousands of dollars of purely personal travel expenses to the corporation during the same years, causing the corporation to deduct his personal expenses as business expenses, Mr. Lippert exhibited either incompetence or mismanagement of the company. (4) In personally collecting $166,000.00 in royalties in 1998 and 1999 for a patent which he developed while employed by Debtor and utilizing its facilities Lippert engaged in self dealing amounting to mismanagement of Intercat.[5] (5) In producing royalty reports to Mobil Oil Corporation which, in the light most favorable to Lippert, failed at minimum to fully disclose Intercat's use of ZSM–5, Lippert engaged in dishonest or incompetent conduct, exposing Intercat to possible damages—and certainly to high litigation costs. (6) In his transfer of substantial intellectual property assets properly belonging to Intercat to Bulldog Technologies, the diversion of royalty receipts from Intercat to Bulldog in 1998 and 1999 of over $238,000.00, and the original funding of Bulldog with profits from a transaction financed by Intercat, Lippert wasted corporate assets and opportunities of Intercat which acts violated his fiduciary duty to the corporation, its shareholders and its creditors.[6]

---

**3.** *Compare In re Stein and Day, Inc.,* 87 B.R. 290, 295 (Bankr.S.D.N.Y.1988). (Holding that debtor's contumacious conduct did not amount to fraud, dishonesty, incompetence, or gross management and that appointment was not in the interest of creditors due to the expertise of debtor's management and the additional administrative expenses which would be incurred); *In re Klein/Ray Broadcasting,* 100 B.R. 509, 511 (9th Cir. BAP 1987) (Holding evidence asserting a conflict of interest on the part of management insufficient as it consisted only of a declaration from the movant's attorney, which was arguably hearsay, and in any event amounted only to predictions of potential conflicts of interest rather than evidence that such conflicts had arisen); *In re Royster Company,* 145 B.R. 88, 90–91 (Bankr. M.D.Fla.1992). (Refusing to appoint a creditors' committee because, although previous transactions were suspicious in nature, they had been fully revealed, because the debtor was operating under the watchful eye of an active creditors' committee and the United States Trustee, because the creditors' committee and the bank group opposed the appointment of a Trustee, and because the Chapter 11 case was nearing confirmation in a liquidation case).

**4.** The Movant contends that the clear and convincing standard of evidence does not apply to this case due to the decisions handed down by the Supreme Court in *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) and *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Because of my conclusion that the evidence is clear and convincing I need not rule on whether a lesser standard would suffice.

**5.** Protection of the business judgment rule will be lost if the director appears on both sides of a transaction or derives any personal financial benefit from it. *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971).

**6.** Lippert owed Debtor the highest duties of care and of loyalty. As the director of a corporation, Lippert's actions must be made on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). Absent an abuse of discretion, business judgments will be respected by the court. *Id.* However, directors that appear on both sides of a trans-

These acts amount to mismanagement at best, and coupled with the timing—namely the pending W.R. Grace judgment—constituted fraud or dishonesty toward creditors. (7) Lippert has not volunteered to rescind any of the transactions which he orchestrated or offered to disgorge any compensation he has received in order to restore the Debtor to the *status quo ante*. He has not suggested that he is or will be capable of pursuing the aggressive, independent investigation of all the transactions in issue, or that he will prosecute litigation to recover assets, or sue for the damages sustained by the debtor. Indeed, since he, his family, or his closely-held corporations are all potential targets of any such litigation, it is impossible to believe that he would do so in the manner that a disinterested person would. *See In re Fiesta Homes of Georgia Inc.*, 125 B.R. 321 (Bankr.S.D.Ga.1990) (finding that the appointment of a trustee would be in the best interest of the creditors due to conflict of interest inherent in the corporate structure); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3rd Cir.1998) (holding that acrimony driven by inherent conflict of interest in the corporation necessitated the appointment of a trustee); *In re Cajun Electric Power Cooperative, Inc.*, 74 F.3d 599 (5th Cir.1996) (adopting on rehearing the opinion of dissent in 69 F.3d 746 at 751) (finding that the structure of debtor cooperative creates an irreconcilable conflict of interest and requires the appointment of a trustee).

These acts, individually and collectively, evidence clear and convincing cause for appointment of a trustee. Having concluded that "cause" has been established by clear and convincing evidence, the Court *shall* order the appointment of a trustee. The facts are remarkably similar to those found conclusive in *In re North American Communications, Inc.*, 138 B.R. 175 (Bankr.W.D.Pa.1992) where the court ordered appointment of a trustee in light of evidence of excessive compensation, personal travel and entertainment expenses paid by the corporation, non repayment of large insider loans, personal use of a yacht and airplane and huge unsecured loans to affiliated companies controlled by the debtor's management.

Interestingly enough, several courts have determined that it is appropriate, after concluding that a Chapter 11 trustee is warranted, to grant limited powers to that trustee. *In re North American Communications, Inc.*, states:

> Although Paltrow and Herman have grossly mismanaged debtor's affairs in the ways detailed previously, their management in other respects has been commendable. Because of their efforts, debtor offers and produces in its state-of-the-art facility a sophisticated product that is attractive to several large cus-

---

action, derive a personal financial benefit from the transaction, or fail to inform themselves of all material information reasonably available to them, will not receive this protection. *Id. See Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del.1971) (holding that a parent corporation owes a fiduciary duty to its subsidiary when there are parent-subsidiary dealings, including self-dealing). As that duty related to intellectual property Lippert failed. With respect to inventions of Lippert himself, Intercat had, at minimum, a non-exclusive right to practice the invention. *United States v. Dubilier Condenser Corporation*, 289 U.S. 178, 187, 53 S.Ct. 554, 77 L.Ed. 1114 (1933) (holding that under the "shop right" rule, an employer, in the absence of an express agreement is granted a nonexclusive right to practice the invention created by the employee,

working during the hours of employment and with his employer's materials and appliances). As a result Intercat has no obligation to pay Lippert royalties, yet Lippert demanded and recovered them personally and later through a closely held corporation. *See Wommack v. Durham Pecan Company, Inc.*, 715 F.2d 962, 965 (5th Cir.1983) (holding that an employer is granted an implied nonexclusive, royalty-free license to use the subject patent for his own purpose). Inventions of the other employees likewise are owned outright by Intercat under the terms of their employment contracts, or because they were employed by Intercat for the express purpose of creating. *United States v. Dubilier Condenser Corporation*, 289 U.S. at 187–88, 53 S.Ct. 554.

tomers. Had Paltrow and Herman not mismanaged debtor's affairs in the ways detailed previously, it is likely that debtor would be flourishing in today's marketplace because of the attractive product that it offers.

Complete ouster of Paltrow and Herman would be detrimental to creditors and to the bankruptcy estate and would be self-defeating. Their continued cooperation is crucial to any successful reorganization of debtor. Paltrow is the major force behind debtor's sophisticated sales operation. Herman is uniquely qualified to oversee the operation of what is a complex product and distribution facility.

*In re North American Communications, Inc.,* 138 B.R. 175, 180 (Bankr.W.D.Pa. 1992) (holding that trustee would be appointed for the limited purpose of investigating and handling debtor's potential alter ego causes of action against its shareholders).

In *In re G & G Transport, Inc.,* the bankruptcy court stated:

I find credible his testimony that G & G is in a competitive industry where customer loyalty is tied to personal relationships. Indeed it appears that there is no challenge to that proposition as the UST states that appointment of a Chapter 11 trustee need not displace Goodman's operations role. (Footnote omitted).

1998 WL 898835 at *4 (Bankr.E.D.Pa. 1998). Similarly, the Court in *In re Madison Management Group, Inc.,* appointed a trustee in a limited role to investigate and handle the debtor corporation's potential alter ego cause of action stating that:

[I]t is in the best interest of the creditors and the estate to appoint a trustee with limited power to investigate any and all potential causes of action ... including, but not limited to, alter ego causes of action, preferences and fraudulent conveyances, including the settlement the day before the petition was filed.

137 B.R. 275, 282 (Bankr.N.D.Ill.1992). None of the cases fully articulated the statutory basis for appointment of a trustee with limited powers. Nevertheless, an examination of the Code reveals that there is a statutory foundation, beyond mere notions of the equity powers or inherent authority of this Court to do so.

■ 11 U.S.C. § 1107 gives the debtor-in-possession certain rights and powers "subject to ... such limitations or conditions as the court prescribes ..." 11 U.S.C. § 1108 similarly provides that "unless the court ... orders otherwise, the trustee [or debtor-in-possession] may operate the debtor's business." Both sections grant the Court broad authority to tailor and define the rights of the debtor-in-possession or a trustee if one is appointed to operate debtor's business.

■ I find that the circumstances of this case warrant such a bifurcation of duties as between Debtor's current management and an independent Chapter 11 trustee. The Debtor is a highly-specialized business operating in a technical and sophisticated industry. Mr. Lippert founded the company 14 years ago and in many respects is the heart and soul of Intercat. Customer recognition of and loyalty to him is a key ingredient of Intercat's business needs and its chances for success. Lippert continues to actively oversee and manage every aspect of the business from product development, to manufacture, to sales, to financial management. He can, if he will, be a key player in saving the company.

Unfortunately, along the way Mr. Lippert made serious mistakes. During the pendency of the Grace litigation he either panicked, or became greedy, or both. During 1997, 1998 and 1999, in addition to his extremely generous compensation package, Mr. Lippert received, directly or indirectly, over $970,000.00 in cash or benefits, at a time when the company's survival was at risk and substantial liabilities to Grace were looming on the horizon. Debtor's counsel argue, eloquently, that what occurred over the past three to four years

was nothing more than the typical self-interested operation of a business common to many closely-held corporations. Perhaps that is true, but it does not make it right, especially when the company is in bankruptcy, where many acts that are otherwise unremarkable are unlawful when viewed through the prism of the Code. Lippert could have continued forever in the manner he was accustomed so long as creditors were paid. When that became impossible and Intercat filed Chapter 11, however, the standards for judging the conduct of Intercat's management were raised. That conduct from 1997 to the present fails to measure up to the standards necessary to justify continuing present management in unfettered control of all aspects of the Debtor's business.

However, Debtor needs Lippert's expertise, and perhaps other members of Debtor's management, in dealing with all operational aspects of the company. This includes all product development, manufacture and sales. Creditors need, and the integrity of the bankruptcy system demands, a trustee to (1) oversee the financial management of the company and (2) to investigate and prosecute all estate causes of action. This Trustee shall be responsible for all matters such as approval of product pricing; executive retention, assignment, termination and compensation; financial management and accountability; expenditure of estate assets, and ongoing payments, if any, to insider corporations and individuals; and investigation and litigation of all estate causes of action against insiders, or third parties, except the pending Mobil Oil case which current management has prosecuted, and should continue to manage.

As contemplated by 11 U.S.C. § 1104(d) the United States Trustee, after consultation with parties in interest, shall appoint, subject to this Court's approval, a Chapter 11 Trustee with specific, but limited, powers as outlined above. Mr. Lippert, subject to the Trustee's oversight, shall continue to serve in an operational role and shall report on a regular and timely basis to the Trustee in the manner directed by the Trustee. Any stipulation further defining the Trustee's duties which may be presented by the United States Trustee, the Debtor, Movant, W.R. Grace, or other creditors, or any dispute over or clarification of this Order will be entertained by the Court on request of a party in interest.

SO ORDERED.